UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| Shepler's Inc. d/b/a Shepler's Mackinac Island Ferry Service, and Mackinac Island Ferry Company d/b/a Arnold Transit Company,<br><br>Plaintiffs,<br><br>v.<br><br>City of Mackinac Island,<br><br>Defendant. | Case No. 2:25-cv-36<br><br>In Admiralty |

## COMPLAINT

Plaintiffs Shepler's Inc. d/b/a Shepler's Mackinac Island Ferry Service and Mackinac Island Ferry Company d/b/a Arnold Transit Company, as and for their Complaint against Defendant City of Mackinac Island, state and allege as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction in admiralty pursuant to 28 U.S.C. § 1333(1) because this case involves a dispute over a maritime contract. Plaintiffs further hereby designate this case as being within the Court's admiralty jurisdiction pursuant to Fed. R. Civ. P. 9(h).

1

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is a resident in this district as defined in the statute.

3. This Court is authorized to grant declaratory relief as requested by Plaintiffs herein pursuant to 28 U.S.C. § 2201.

## PARTIES

4. Plaintiff Shepler's Inc. d/b/a Shepler's Mackinac Island Ferry Service is a Michigan Domestic Profit Corporation with its principal place of business located at 556 E Central Ave, Mackinaw City, MI 49701.

5. Plaintiff Mackinac Island Ferry Company d/b/a Arnold Transit Company is a Michigan Domestic Profit Corporation with its principal place of business located at 587 N. State St., St. Ignace, MI 49781.

6. Defendant City of Mackinac Island is a Michigan municipality located in Mackinac County, Michigan.

## STATEMENT OF FACTS

7. The City of Mackinac Island (the "City") is located on Mackinac Island, an island located wholly within Lake Huron, a navigable waterway of the United States. The City encompasses the entire island.

8. Mackinac Island is a historically significant tourist destination with approximately 1.5 million people visiting the island each year from around the world. The 2020 census listed that 583 residents live in the City.

9. The City's nearest land-based cities are St. Ignace, located in Mackinac County, Michigan, in Michigan's Upper Peninsula, and Mackinaw City, located in both Cheboygan and Emit Counties, Michigan, in Michigan's Lower Peninsula.

10. The Michigan Legislature founded the City of Mackinac Island in 1899. Under Chapter XVI, the City's founding charter provided that:

> The council of said city may regulate and license ferries from such city or any place of landing therein to the opposite shore, or from one part of the city to another; and may require the payment of such reasonable sum for such license as to the council shall deem proper and may impose such reasonable terms and restrictions in relation to the keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper, and provide for the revocation of any such licenses and for the punishment, by proper fines and penalties, of the violation of any ordinance prohibiting unlicensed ferries. and regulating those established and licensed.

11. The City operates its decision-making through a mayor and a city council (the "City Council"). The mayor presides over the City Council meetings, which consist of regular meetings and certain special meetings.

12. On June 20, 2012, the City Council approved Ordinance Number 465, which became effective July 10, 2012 (the "Ordinance"). The Ordinance regulates ferry boat operations to and from the City, and thus the entirety of Mackinac Island. In pertinent part, it states that "no person shall operate a ferry boat service nor shall any person provide a ferry boat service in the City without such person having first obtained a franchise from the city."

13. Under Section 9, related to ferry boat rates, the Ordinance provides that:

> No ferry boat company shall make any unjust or unreasonable discrimination in rates, charges, classifications, promotions, practices, regulations, facilities or services for or in connection with ferry boat services, nor subject any person to any prejudice or disadvantage in any respect whatsoever; however, this shall not be deemed to prohibit the establishment of a graded scale of charges and classification of rates to which any customer or passenger coming within such classification shall be entitled.

14. Under Section 14, related to fees charged by the City to franchisees, the Ordinance provides that:

> During the term of any franchise granted pursuant to this division for the operation of ferry boat service, the person granted such franchise shall pay to the City in consideration of the granting of such franchise[.]

15. Plaintiff Shepler's Inc. d/b/a Shepler's Mackinac Island Ferry Service ("Shepler's") is a family-based company that has been operating ferry services to and from Mackinac Island for approximately eighty years. In doing so, Shepler's has worked closely with the City Council to ensure that it meets the transportation needs for Mackinac Island, including the specific needs for residents, commuting workers, and tourists. Shepler's operates ferry services between Mackinac Island and St. Ignace, and between Mackinac Island and Mackinaw City.

16. Shepler's also owns property in both St. Ignace and Mackinaw City. With this property, Shepler's has developed parking lots, which it uses to operate a business for parking services.

17. On or about June 27, 2012, Shepler's entered into a contract with the City for the purpose of establishing a "nonexclusive ferryboat franchise authorizing [Shepler's] to operate a public ferryboat service to and from the City of Mackinac Island[.]" ("Shepler's Contract"). (Attached hereto as **Exhibit 1** is the Contract between the City and Shepler's.)

18. The Shepler's Contract has a twenty-five-year term, from July 1, 2012 to June 30, 2027.

19. In consideration of Shepler's right to operate its ferry boat services, Shepler's pays the City a seasonal monthly franchise fee.

20. The Shepler's Contract provides that Shepler's shall "file its schedule of services and rates for the next season," and, through a prescribed "MEMORANDUM OF UNDERSTANDING," the contract provides that: "All lines determine their own schedules and rates. However, the boat lines will file their schedules and rates with the City."

21. Under Section 9, the Shepler's Contract provides that:

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

5

22.     The Shepler's Contract constitutes a federal maritime contract because the principal objective of that contract is maritime commerce, specifically to transport persons and property, from all over the world, over a navigable waterway of the United States.

23.     In 2022, Hoffmann Family of Companies (the "Hoffmann Family") purchased Shepler's, creating a partnership between the Shepler family and the Hoffmann family. The Shepler family remains critically involved in the operations of the company.

24.     Plaintiff Mackinac Island Ferry Company d/b/a Arnold Transit Company ("MIFC") is the culmination of several companies with approximately 140 years of experience with ferry services to and from Mackinac Island. MIFC also operates ferry services between Mackinac Island and St. Ignace, and between Mackinac Island and Mackinaw City.

25.     MIFC also owns property in both St. Ignace and Mackinaw City. With this property, MIFC operates a business for parking services.

26.     On or about October 18, 2023, MIFC entered into a contract with the City for the purpose of establishing a "nonexclusive ferryboat franchise authorizing [Arnold Transit] to operate a public ferryboat service to and from the City of Mackinac Island[.]" ("MIFC Contract"). (Attached hereto as **Exhibit 2** is the Contract between the City and MIFC.)

6

27.   Although entered into years later, the terms of MIFC Contract are otherwise identical to the Shepler's Contract, including the same expiration date of June 30, 2027.

28.   Because of their similarities, both the Shepler's Contract and the MIFC Contract are commonly referred to as the "Franchise Agreement," identifying the contract between the City and the respective franchisee.

29.   In consideration of MIFC's right to operate its ferry boat services, MIFC pays the City a seasonal monthly franchise fee.

30.   The MIFC Contract provides that MIFC shall "file its schedule of services and rates for the next season," and, through a prescribed "MEMORANDUM OF UNDERSTANDING," the contract provides that: "All lines determine their own schedules and rates. However, the boat lines will file their schedules and rates with the City."

31.   Under Section 9, the MIFC Contract provides that:

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

32.   The MIFC Contract constitutes a federal maritime contract because the principal objective of that contract is maritime commerce, specifically to transport persons and property, from all over the world, over a navigable waterway of the United States.

33. The first several months of MIFC's performance under the MIFC Contract were tumultuous. Passengers lodged numerous complaints with the City Council related to MIFC's services, and the need to address MIFC's lackluster operations became a continuous problem for the City. During this same period, Shepler's operated a first-class ferry service without any of these same problems.

34. In 2024, to remedy the ongoing concerns, the City initiated communications with representatives from the Hoffmann Family about a potential purchase of MIFC. The City encouraged the Hoffmann Family to invest in MIFC, thus providing Mackinac Island with two ferry companies that are capable of first-class ferry service.

35. During the Hoffmann Family's due diligence for a potential purchase of MIFC, it was discovered that MIFC would require a substantial capital investment because of its aging fleet and outdated operations.

36. Despite these concerns, on or about June 28, 2024, the Hoffmann Family purchased MIFC, recognizing that MIFC provided a long-term business opportunity.

37. Shortly after its purchase, the Hoffmann Family discovered that MIFC's assets were in a worse condition than was originally known. The Hoffmann Family found that MIFC's ferry fleet required significant repairs, many of which raised critical safety concerns. During the first several months

of ownership, the Hoffmann Family invested approximately $6 million in MIFC, the majority of which went to repair and modernize the fleet.

38. The necessary repairs disrupted MIFC's ferry services in 2024. To help remedy the problem, the Hoffmann Family worked closely with the City Council, including utilizing Shepler's fleet to help ensure that the island had adequate ferry services during MIFC's rehabilitation.

39. In the fall of 2024, as required under the Franchise Agreement, both Shepler's and MIFC submitted their proposed rates for ferry services to the City Council for the 2025 season.

40. Both Shepler's and MIFC proposed a slight increase in their ticket rates for the 2025 season. To explain the increase, representatives for Shepler's and MIFC notified the City that, in addition to the substantial capital investments that need to be recouped over time, both Shepler's and MIFC were experiencing a significant increase in expenses, including a $500,000 increase in fuel prices, an increase in local taxes of $50,000, a $1,900,000 increase in payroll, and the approximately $420,000 in lost ticket value that Shepler's and MIFC, in conjunction with the City, gives away for purposes of promotion.

41. In addition to a slight increase in ferry rates, Shepler's and MIFC's submission also included certain ancillary costs, allowing customers to choose between different services based on the customer's specific needs. For example, Shepler's instituted significant technology improvements for its ferry services

9

that incentives mobile technology over traditional paper tickets. In turn, while customers can use traditional tickets, doing so comes with a slight cost.

42. In their continued discussions with the City, Shepler's and MIFC emphasized that their priority is to draw as many passengers as possible to Mackinac Island through safe and efficient ferry services. They explained that they generate revenue through a high volume of tourists to the island, which is a shared interest with other business on Mackinac Island. Shepler's and MIFC explained their shared interest in the viability of Mackinac Island's tourist industry.

43. On or about September 11, 2024, the City Council passed a resolution that rejected Shepler's and MIFC's proposed rate increase for ferry boat services and their proposal for additional ancillary costs. The resolution states that the "recent purchase of all the ferry boat companies by one company presents the City with a monopoly situation, a situation the City has never faced before." The resolution states that the City is "freezing the rates that were in place for the 2024 season," with certain listed exceptions

44. Plaintiffs dispute that the Franchise Agreement provides the City with unilateral authority to declare a "monopoly," or specifically the existence of "no competition," for purposes of regulating the rates for ferry services under that Franchise Agreement.

10

45. Plaintiffs also dispute that the Franchise Agreement provides the City with authority to reject their proposed ancillary costs.

46. On or about September 11, 2024, the City also formally resolved that "parking rates must be brought to the City Council by January 8, 2025." These parking rates reference the rates that Shepler's and MIFC charge for parking on their respective lots in either St. Ignace or Mackinaw City.

47. During the winter of 2024-2025, representatives from the Hoffmann Family, on behalf of Shepler's and MIFC, sought to work with the City Council, including an explanation regarding why a ferry rate increase for 2025, with some additional ancillary costs, is important because of increased expenses. On January 8, 2025, the City stated that, while "the Council appreciate the hard work that Hoffmann has put in to providing ferry services to Mackinac Island," the City "does not have an understanding [of the] full costs as that is not shared with the City." The City's mayor unilaterally declared that "the City is dealing with a monopoly[.]"

48. On or about February 4, 2025, in the interest of continued cooperation with the City Council, counsel for Plaintiffs shared their proposed parking rates for 2025 for the parking lots located on Mackinaw Island and St. Ignace. In doing so, however, Plaintiffs' counsel also stated that "the City has no right under the Francise Agreements [to approve] the schedule and parking rates[.]"

11

49. On February 19, 2025, the City Council unanimously passed a motion that (a) "rejected" both Shepler's and MIFC's proposed parking rates; (b) demanded that they both "remove all reference to the unapproved parking rates from their websites, other distributions, and advertisements; and (c) demanded that they provide the City with information regarding their parking rates from 2023 and 2024, including information on lot locations and capacities.

50. The following week, on February 26, 2025, the City unanimously passed another motion related to parking, which restated its prior motion, and gave Shepler's and MIFC's until March 3, 2025 to comply. During this meeting, counsel for the City stated that City's legal position is, at least in part, the "Franchise Agreement" provides the City with its authority to make these demands.

51. Plaintiffs dispute that the Franchise Agreement provides the City with any authority, whether direct or implied, to regulate Plaintiffs' parking businesses in either Mackinaw City or St. Ignace.

## COUNT I
### (Declaratory Judgment Under 28 U.S.C § 2201)

52. The preceding paragraphs are hereby realleged and incorporated by reference as if fully set forth herein.

12

53. Pursuant to 28 U.S.C. § 2201, an "actual controversy" exists between Plaintiffs and Defendant regarding the "rights and other legal relations" related to the Franchise Agreement.

54. Under Section 9, the Franchise Agreement provides that:

In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

55. Citing the Franchise Agreement, Defendant has unilaterally declared that a monopoly exists for ferry services to and from Mackinac Island and thus Defendant can establish its own fares for these services.

56. Plaintiffs dispute that the Franchise Agreement empowers Defendant to unilaterally "find" the existence of a "no competition" for purposes of establishing fares.

57. Citing the Franchise Agreement, Defendant has taken the position that it can regulate Plaintiff's proposed ancillary costs related to its ferry services.

58. Plaintiffs dispute that the Franchise Agreement empowers Defendant to regulate ancillary costs related to their ferry services that are not fares for the same.

59. Citing the Franchise Agreement, Defendant has also unilaterally declared that it can regulate the Plaintiffs' parking businesses in Mackinaw

City and St. Ignace, including requesting that Plaintiffs cease advertising and compelling the production of financial documents.

60. Plaintiffs dispute that the Franchise Agreement empowers Defendant to regulate Plaintiffs' parking businesses in Mackinaw City and St. Ignace, including any power to demand that they cease advertising or compel their production of financial documents.

WHEREFORE, Plaintiffs pray for judgment as follows:

1. For the Honorable Court to enter a declaratory judgment declaring that the "no competition is found to exist" clause under Section 9 of the subject contracts does not permit Defendant to unilaterally declare the existence of a monopoly for purposes of regulating schedules and fares for ferry services.

2. For the Honorable Court to enter a declaratory judgment declaring that the "schedules and fares" clause under Section 9 of the subject contracts does not include ancillary costs that Plaintiffs may choose to charge customers that are not traditional schedules or fares related to ferry services.

3. For the Honorable Court to enter a declaratory judgment declaring that the "schedules and fares" clause under Section 9 of the subject contracts is specifically limited to schedules and fares for the operation of Plaintiff's ferry business and not for Plaintiffs other businesses.

4. For pre- and post-judgment interest;

5. For all expenses, and costs and disbursements, as allowed by law;

6. Such other and further relief the Honorable Court deems just and equitable.

ECKLAND & BLANDO LLP

Dated: March 3, 2025

S/ ROBERT T. DUBE, JR.
Vince C. Reuter (#MN390874)
(*Admission Pending*)
Robert T. Dube, Jr. (#MN38988)
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
(612) 236-0160
vreuter@ecklandblando.com
rdube@ecklandblando.com

*Counsel for Plaintiffs*