UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHEPLER'S INC., et al.,

       Plaintiffs/Counter-Defendants,

                                     Case No. 2:25-cv-36

v.

                                     HON. ROBERT J. JONKER

CITY OF MACKINAC ISLAND,

          Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER

       This is a dispute between the City of Mackinac Island and the companies that ferry passengers between the Island and mainland Michigan.  The parties disagree over many particulars, but the current focus is on who holds the authority to set the rates for ferry services.  The Franchise Agreement governing the parties' relationship gives the Ferry Companies this authority, so long as there is competition in ferry boat services.  The City says there is no longer competition, so it can now assert its right to set the fares.  The City has also adopted a new ordinance empowering it to approve all ferry rates and to regulate ancillary service rates like luggage and parking fees.  This has all crescendoed into two competing motions for preliminary injunctive relief now before the Court.  The first is the Ferry Companies' motion asking the Court to enjoin the City from enacting or enforcing the new ordinance.  (ECF No. 24).  The second is the City's motion asking the Court to enjoin the Ferry Companies from raising any rates connected to their ferry services to and from the Island.  (ECF No. 35).

The key to both motions runs through the Franchise Agreement's "no competition" provision. When "no competition is found to exist" in ferry service, the City is entitled to step in and regulate fares. But until that time, the Ferry Companies can set their own fares. Each side has plausible constructions of what "no competition" means that supports their respective views. But a final call on the merits of that issue is premature and unnecessary. The question that resolves the preliminary injunction issue is simply whether either side gets to decide the issue unilaterally, or whether both must await and abide the decision of a third party like this Court. And because there is a strong probability of success on the Ferry Companies' argument that neither side gets to make the call on its own, the Court will **GRANT** the Ferry Companies' motion and **DENY** the City's. On balance of the equities, a temporary *status quo* injunction that maintains uninterrupted ferry service under contract terms in effect for the last thirteen years will work the least harm and best protect the interests of the parties and of the public.

BACKGROUND

Mackinac Island is a special place. Nestled between Michigan's upper and lower peninsulas in the Straits of Mackinac, the Island draws visitors from far and near. The City of Mackinac Island is a charter municipal corporation with land areas on both Mackinac Island and its smaller neighbor to the southeast, Round Island. The City is Mackinac Island's only municipality and is home to about 550 permanent residents. Every year, tourists, seasonal residents, and seasonal workers converge on the City for its peak summer season. The City prohibits motor vehicles so residents and visitors rely on other modes of transportation like bicycles and horse-drawn carriages to move about the Island.

I.        **History of Ferry Service for Mackinac Island**

There is no bridge connecting the Island to Michigan's mainland, meaning residents and visitors must travel by water or air to and from the Island.  Their practical options are threefold: private boat, direct flight, or ferry boat.  The latter is the most common method and the one driving this dispute.  What began so many years ago as mostly coal-fire steamboats has developed into what is today a varied fleet of multi-deck catamarans, classic ferries, and other more modern vessels that carry passengers to and from the Island.  And since its founding, the City has worked together with private companies to facilitate this service—a feature rooted in the City's founding Charter.  The Charter vests the City Council with the authority:

> to establish or authorize, license and regulate ferries to and from the city, or any place therein, or from one part of the city to another, and to regulate and prescribe from time to time the charges and prices for the transportation of persons and property thereon[.]

(Charter Chp. IX, § 1, part 13, ECF No. 38-6, PageID.620–21).  It further provides:

> The council of said city may regulate and license ferries from such city or any place of landing therein to the opposite shore, or from one part of the city to another; and may require the payment of such reasonable sum for such license as to the council shall seem proper and may impose such reasonable terms and restrictions in relation to the keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper, and provide for the revocation of any such licenses and for the punishment, by proper fines and penalties, of the violation of any ordinance prohibiting unlicensed ferries, and regulating those established and licensed.

(Charter Chp. XVI, *id.* at PageID.626).  This structure positions the area's ferry companies as franchises that are privately owned but regulated to serve a public function.

A.  **The Ferry Boat Code**

The City exercised this Charter power in 1977 to adopt a series of ordinances known as the Ferry Boat Code.  *See Arnold Transit Co. v. City of Mackinac Island*, 99 Mich. App. 266, 274 (1980), *aff'd*, 415 Mich. 362 (1982).  The Code was amended in 2012, which remains the operative

3

version as of this writing.  Among other things, the Code "[p]rovide[s] fair regulation of ferry service to and from the city in the interest of the public" and "[p]romote[s] and encourage[s] adequate, economical and efficient ferry service to and from the city[.]"  (2012 Code, § 66-462, ECF No. 38-7, PageID.628).  It codifies the City's right to franchise ferry boat operations, requiring ferry companies to apply to the City Council for a franchise.  (2012 Code, §§ 66-491, 492, *id.* at PageID.630–31).  If issued, the franchise "shall be a nonexclusive franchise for a term of years, not to exceed 20 years[.]"  (2012 Code, § 66-494, *id.* at PageID.631).  The Code further provides for payment of a monthly $50,000 franchise fee to be divided by the active franchisees for the month the fee is owed.  (2012 Code, § 66-495, *id.* at PageID.631–32).[1]

### B.  The Franchise Agreements

Under this framework, the City has for years issued franchises to the key players operating in the Straits of Mackinac.  Until 2016, those players were Arnold Transit Company, Shepler's, and Star Line.  (ECF No. 7, PageID.75).  The City held franchise agreements with each of these three ferry lines for the period of July 1, 2012 through June 30, 2027 (ECF Nos. 7-3, 7-5), but in 2016, Star Line acquired Arnold and later rebranded as Mackinac Island Ferry Company ("MIFC") (ECF No. 7, PageID.75).  So in the fall of 2023, Shepler's and MIFC entered into amended franchise agreements, each still set to expire June 30, 2027 but otherwise materially identical to the prior agreements.  (ECF Nos. 7-4, 7-6).  Given the symmetry in terms, the Court refers to these two amended agreements as one "Franchise Agreement" between the City and the two Plaintiff Ferry Companies in this case, Shepler's and MIFC.  (ECF No. 1, PageID.7).

---

[1] Before the 2012 amendments, that franchise fee was described as an annual charge of $600,000. The 2012 Code switched to a monthly fee of $50,000 (or $600,000 annually), with an automatic CPI adjustment.

The Franchise Agreement provides for a "nonexclusive ferryboat franchise" between the City and the Ferry Companies. (ECF No. 7-4, PageID.108).[2] It requires the Ferry Companies to file their "schedule of services and rates for the next season with the City Clerk" not later than November 15 of each year. (*Id.*). It also requires the Ferry Companies to "provide ferry boat service to and from the City during the regular ferry boat season," which is the period between April 21 and October 31 of each calendar year. (*Id.* at PageID.109). In consideration of the City's granting of the franchise, the Ferry Companies are to pay the City a monthly franchise fee of $50,000, "divided by the number of ferry boat franchises in effect for the month the franchise fee is owed," with annual cost-of-living adjustments. (*Id.* at PageID.110–11).

Of particular significance in this case, Section 9 of the Franchise Agreement provides:

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

(*Id.* at PageID.112). The Agreement does not define "competition." It provides that the "franchise is subject to all applicable provisions of the Charter of the City of Mackinac Island and ordinances thereof, particularly Ordinance No. 465, being the Ferry Boat Code, as well as the laws and Constitution of the State of Michigan, and shall, whenever possible, be construed as consistent with them." (*Id.*). And it incorporates the terms of the June 2, 2012 Memorandum of Understanding, including that "[a]ll lines determine their own schedules and rates. However, the boat lines will file their schedules and rates with the City." (*Id.* at PageID.113).

---

[2] Further citations to the Franchise Agreement are to Shepler's Amended Franchise Agreement. (ECF No. 7-4). Identical terms can be found in parallel structure in MIFC's operative Amended Franchise Agreement. (*See* ECF No. 7-6).

## II.      Hoffman Family of Companies Acquires Both Remaining Ferry Lines

When Star Line acquired Arnold in 2016, Shepler's and Star (now MIFC) remained under separate ownership.  (*See* ECF No. 25-4).  In 2022, the Shepler family sold their company to the Hoffman Family of Companies, a "multi-vertical, family-owned private equity firm[.]"  (ECF No. 7-7, PageID.75).  Two years later, Hoffman acquired MIFC, bringing all Mackinac ferry lines under common ownership and control.  (ECF No. 25-4, PageID.317).  According to the Ferry Companies, this sort of buyout was one of the few things that could rescue Star's aging fleet and struggling operation.  (*Id.* at PageID.316–17; ECF No. 1, PageID.8).  In fact, Chris Shepler claims that the City commissioned him to monitor the failing Star Line and provide regular reports, and that Mayor Doud expressly encouraged the Hoffman acquisition.  (ECF No. 25-4, PageID.316–17).  Mayor Doud denies these claims in her own declaration, but she does not disagree that Star had its issues.  She attests:

> The City of Mackinac Island had been experiencing difficulties dealing with the management and complaints from the public regarding MIFC staff banning customers from riding the ferry. The City Council had numerous meetings and corresponded numerous times with MIFC to resolve management issues which was met with much difficulty by the management.

(ECF No. 36-2, PageID.469).  She also acknowledges that one of Star's winter ferries had broken down due to a steering failure.  (*Id.*).  The Ferry Companies say this was just the tip of the iceberg— the Star fleet had fallen into such disrepair that Hoffman invested the better part of $6 million to revive the ships post-acquisition.  (ECF No. 1, PageID.8–9).  The City says it has no proof of this.

## III.      The City Determines that the Ferry Companies are Under a Monopoly

It is that surprise investment—along with increased fuel prices, local taxes, and payroll— that motivated the Ferry Companies' recent rate hike.  (ECF No. 1, PageID.9).  In late 2024, the Ferry Companies brought their proposed $2.00 fare increase to the City Council, as required under the Franchise Agreement.  They say this was to provide notice, not to seek the City's approval.

6

(ECF No. 25, PageID.276).  This was the Ferry Companies' first rate change since 2022.  (*Id.* at PageID.273).[3]

The City Council "rejected" the rate change, passing a resolution to freeze the 2024 rates because "[t]he recent purchase of all of the ferry boat companies by one company presents the City with a monopoly situation, a situation the City has never before faced."  (ECF No. 36-9, PageID.505).  In other words, the City was invoking Section 9 of the Franchise Agreement to assert its jurisdiction over fares.  The City says it can unilaterally determine whether "no competition" exists under Section 9 because of the regulatory power delegated to it by the State of Michigan through the City Charter—namely, Chapter IX, Section 1, which grants the City Council the power to "regulate ferries to and from the city," including the power "to regulate and prescribe from time to time the charges and prices for the transportation of persons and property."  (Charter Chp. IX, § 1, part 13, ECF No. 38-6, PageID.620–21).  The City Council's resolution recognized the Ferry Companies' increased expenses, but cited concern that the Companies had not provided enough information about revenues and costs.  (ECF No. 36-9, PageID.505).

In February 2025, the Council again "rejected" the Ferry Companies' rates—this time for parking.  (ECF No. 1, PageID.12).  In support of this decision, the City invokes Chapter XVI, Section 1 of its Charter, which gives the City Council the power to "regulate and license ferries from such city or any place of landing therein to the *opposite shore* . . . ."  (Charter Chp. XVI, ECF No. 38-6, PageID.626) (emphasis added).  It relies on this "opposite shore" language as proof that the City's regulatory power extends beyond the ferry boats themselves and into ancillary services like parking.  (*See* ECF No. 36, PageID.447).  It says that "virtually all passengers must use the

---

[3] The Court notes that the increase appears to approximate the rate by which the CPI rose during the same two-year period the Franchise Agreement automatically increased the franchise fee by the CPI increase.  (*E.g.*, 2024 CPI of 313.7 divided by 2022 CPI of 292.7 times $36 equals $38.58).

parking lots to access the ferries," so parking is a necessary expense for ferry passengers.  (ECF No. 7, PageID.84).  On these bases, the City Council passed one motion in February 2025 requiring the Ferry Companies to provide information about their 2023 and 2024 parking rates and lots, and a week later passed another motion setting a March 3, 2025 deadline for the requested information. (ECF No. 1, PageID.12).

The Ferry Companies responded by implementing the fares they disclosed, consistent with the 2102 Ferry Code, Memorandum of Understanding, and terms of the Franchise Agreement. They also filed this lawsuit.  Today, Shepler's charges $38 for adult round-trip tickets and $26 for children ages 5–12 years old.  (ECF No. 38-13, PageID.684).  MIFC's basic fares are $2 cheaper than Shepler's ($36 and $24 for the same respective age categories), and they also offer a slower, "classic" ride that costs $22.95 for adults and $17.95 for children ages 5–12 years old.  (ECF No. 38-11, PageID.661; ECF No. 38-13, PageID.675).  A bicycle costs an additional $21 to bring aboard a Shepler's vessel and $19 for MIFC.  (ECF No. 38-13, PageID.684; ECF No. 46-1, PageID.969).  Both Ferry Companies offer $10 day parking and $20 overnight parking, with more expensive "premium" options available too.  (ECF No. 36-13, PageID.529; ECF No. 46-1, PageID.969).  There are more economical season pass offerings available to commuters, residents, and Island employees for both fares and parking (*see* ECF No. 36-13, PageID.528), which are sometimes borne by the Island's employers (*see, e.g.*, ECF No. 38-9, PageID.642).

### IV.    The Ferry Companies File Suit

On March 3, 2025, the Ferry Companies brought this action against the City, in admiralty, asserting one count for declaratory judgment under 28 U.S.C. § 2201.  (ECF No. 1).  The Complaint does not seek a judgment declaring that "competition is found to exist" under Section 9 of the Franchise Agreement.  Instead, it seeks three more limited declarations from the Court:

8

(1) that the "no competition" clause of Section 9 does not permit the City to "unilaterally declare the existence of a monopoly for purposes of regulating ferry schedules and fares," (2) that the "schedules and fares" clause of Section 9 "does not include ancillary costs that are not traditional schedules or fares related to ferry services," and (3) that the "schedules and fares" clause under Section 9 "is specifically limited to schedules and fares for the operation of [the Ferry Companies'] ferry business and not for [their] other businesses."  (*Id.* at PageID.14).

The City answered the Complaint a month later and asserted its own Counterclaim against the Ferry Companies.  (ECF No. 7).  It brings three antitrust claims under federal and state law, one claim for breach of contract for the Ferry Companies' "failure and refusal to cooperate in the City's regulatory program," and one claim for a declaratory judgment.  (*Id.* at PageID.82–88). While the Ferry Companies ask the Court simply to determine who gets to make the "no competition" call and to find that parking falls outside of Section 9's ambit, the City goes a step further.  It asks the Court to declare that (1) the City holds the power to regulate parking rates in connection with ferry transportation to Mackinac Island; (2) the Charter, Code, and Franchise Agreement empower the City to determine that competition between the Ferry Companies has ceased; (3) competition has ceased as a matter of fact and law; (4) the Ferry Companies have obtained monopolies in ferry boat service and parking spaces necessary for the operation of ferry boat services to and from the Island in violation of federal and state antitrust laws; (5) the Ferry Companies are obligated by Section 9 to cooperate with the City in its regulation of rates for ferry transportation to and from the Island; and (6) the Ferry Companies' breach has irreparably injured the City by interfering with its regulatory authority, harming City residents, businesses, and employees, and deterring visitors.  (*Id.* at PageID.85–88).

## V.    The City Adopts a New Ferry Boat Ordinance and the Ferry Companies Respond

On April 30, 2025, the City adopted Ordinance No. 628, designed to repeal and replace the existing Ferry Boat Code.  (ECF No. 25-5).  The 2025 Ordinance makes several amendments to the 2012 version, most of which relate to rate approval and ancillary services like parking.  It adds the provision, "[a]ny request for increases to fares or rates, or decreases in the Schedule of Services shall require a minimum of thirty (30) days' notice of such changes prior to any such Council discussion or decision."  (*Id.* at PageID.322).  It also adds the term "Service Rate," which is defined to mean "any rate, fare, fee and/or charge the Ferry Boat Company charges for any service related to the Ferry Boat service, including but not limited to transportation of passenger, transportation of property, luggage, and parking fees."  (*Id.* at PageID.321).

The 2025 Ordinance also includes an entirely new division titled "Regulation," which provides that the City Council "shall have and exercise complete power to regulate all rates, fares, fees, charges, services, rules, conditions of service and all other matters pertaining to Ferry Boat Service provided by a Ferry Boat Company or Companies."  (*Id.* at PageID.325–26).  The division also adds an "Annual Regulation Fee for the cost of regulation," which starts at $150,000 per ferry company in 2025 and will change according to the "forecasted cost of regulation" for each subsequent year.  (*Id.* at PageID.326).  The formula for this fee is as follows:

$$\textit{Annual Regultory Fee} = \textit{Projected Current Year Regulatory Cost} - (\textit{Previous Year Regulatory Fee} - \textit{Actual Regulatory Cost})$$

(*Id.*).

Finally, the new division sets forth a "Regulatory Procedure," which requires that the franchisees provide the City Council with detailed documentation regarding ferry service operations and "demonstrate that the proposed Services Rates are just and reasonable for the

10

services provided." (*Id.*).  This procedure also states that the franchisees are entitled to a fair return on equity in their ferry boat service, and that the City Council "shall determine the Service Rates and Schedule of Services no later than November 30th of the year prior to the year the rates are scheduled to go into effect," with a final determination by no later than December 30.  (*Id.* at PageID.327).  The City gave Ordinance No. 628 an effective date of May 28, 2025.  (*Id.*).

The Ferry Companies responded by moving to dismiss the City's Counterclaim under Rules 12(b)(1) and (6) (ECF No. 18) and by seeking a Temporary Restraining Order and Preliminary Injunction enjoining the City from enacting or enforcing the new ordinance (ECF No. 24).  In their Motion to Dismiss, the Ferry Companies contend that the City lacks Article III and antitrust standing and has failed to plead the requisite elements of its antitrust claims.  (ECF No. 19).  They also argue that the Franchise Agreement does not give the City authority to unilaterally declare "no competition" under Section 9, and that it contains no language giving the City the right to regulate ancillary services like parking, priority boarding, or luggage.  (*Id.*).  Their Preliminary Injunction Motion argues that the 2025 Ordinance breaches the Franchise Agreement, imposes unlawful restrictions and unconstitutional confiscatory rates, reaches beyond the City's regulatory authority by attempting to control non-ferry services, and institutes an unconstitutional revenue-generating tax.  (ECF No. 25, PageID.269–72).

The Court heard argument on these issues at the initial Rule 16 conference in Marquette on May 28, 2025.  (*See* ECF No. 28).  The 2025 Ordinance was set to go into effect that same day, but it contained a scrivener's error that would have repealed the wrong ordinance instead of the intended 2012 Ferry Boat Code.  (*Id.* at PageID.375).  So the City voted later that day to correct the scrivener's error, passing an amended 2025 Ordinance (Ordinance No. 629) aimed to repeal and replace the 2012 Code as intended.  (ECF No. 36, PageID.442 n.5).  The amended 2025

Ordinance is otherwise materially identical to the earlier version.  It was first passed with an effective date of June 24, 2025 (ECF No. 38-19, PageID.717), but the parties later agreed to a new effective date of July 1, 2025 to accommodate briefing schedules on the pending motions (ECF No. 41).

After argument and a preliminary settlement conference, the City moved on June 6, 2025 for its own preliminary injunction.  (ECF No. 35).  It asks the Court to enjoin the Ferry Companies from increasing or imposing any new rates, fees, or charges associated with their ferry transportation services to or from the Island "unless and until the City approves those increased or new rates, fees, or charges" under the City's Charter and the 2025 Ordinance.  (*Id.*).  The City's motion argues that it has the authority to determine that "no competition" exists between the Ferry Companies, and, having rightly found "no competition" to exist, it has the authority to control the charges related to ferry services.  (ECF No. 36).  The Ferry Companies therefore breached the Franchise Agreement in raising their rates without approval, argues the City, and they must be enjoined from continuing in that breach.  (*Id.*).

Both preliminary injunction motions have been fully briefed and are ripe for decision without further argument.

### LEGAL STANDARDS

A preliminary injunction is a temporary remedy designed "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  The party seeking a preliminary injunction bears the burden of establishing its entitlement to it.  *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).  A court addressing a motion for a preliminary injunction considers four factors: "(1) the likelihood

that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction. *Certified Restoration*, 511 F.3d at 541.  A movant need not win on every factor to obtain a preliminary injunction. *Id.*  Instead, the factors "are to be balanced against each other." *Id.* (quotation omitted).  The court "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Id.* at 542 (quotation omitted).  The court should, however, analyze all four factors. *Id.*

## DISCUSSION

The Franchise Agreement is the key to each side's position on the pending motions in this case.  In particular, Section 9's statement that "the City has the right to assert its jurisdiction over schedules and fares" if "no competition is found to exist in ferry boat service to and from the City" is the real nub of the matter.  Each side has a textually plausible theory on the ultimate merits question of whether there is or is not competition in ferry service at this time.  The City can plausibly argue that "no competition" means all ferry services are under common ownership and control, which happened when the Hoffman Family of Companies acquired both the existing Franchise Agreements.  The Ferry Companies can plausibly argue that "no competition" means consumers have no real choice in carrier, level of service, and price points, which has not yet happened despite the common ownership of separately operated ferries.  But the Court cannot and need not resolve that ultimate merits issue at this point, or even approximate probability of success beyond saying both views are plausible.  What the Court can say, though, is that there is a strong probability of success on the Ferry Companies' position that neither side gets to make the final call on its own.  That determination paves the way for entry of a *status quo* injunction against the

City's implementation of a new ordinance before the Court determines who is right on the "no competition" merits.

A *status quo* injunction is also supported by other preliminary injunction factors.  On irreparable harm, the surest way to provide uninterrupted ferry service to and from the Island is to preserve—not disrupt—the *status quo*.  And the public and private interests are likewise served by continued service on rates the Ferry Companies have published since last Fall.  In the interim, some consumers may pay more for ferry service than the City believes they should be paying.  But that harm is far eclipsed by the risk of a mid-season ferry disruption with potentially ruinous consequences for residents, guests, and businesses that have planned their trips and operations on rates and schedules published last Fall.  Indeed, even the City's new ordinance recognizes the need for predictability in rates by ensuring the final rate determination by December 30 of the year preceding the operating season.

## I.    Likelihood of Success

To demonstrate the first prong of the test, the movant must "show more than a mere possibility of success."  *Certified Restoration*, 511 F3d at 541.  "It is ordinarily sufficient if the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id.* (quotation and alteration omitted).  The Ferry Companies have raised such questions here.  They have shown that the 2025 Ordinance impairs their rights under the Franchise Agreement by giving the City powers not conferred by Charter or by contract.  It usurps, on the City's unilateral say-so, the Ferry Companies power to set their own rates and schedules.  And it reaches beyond the Charter in regulating services ancillary to ferry service, like parking.  The City, on the other hand, has *not*

14

shown that it is authorized to regulate all charges under the terms of the operative Franchise Agreement by unilaterally declaring a monopoly in ferry service.

### A. Boat Fares

A franchise, like those at issue here, is a contractual agreement. *See* Mich. Const. art. 7, § 29. And like any contractual agreement, the parties are free to take from, add to, or modify it as they see fit. *Soltys v. Soltys,* 336 Mich. 693, 697 (1953). Yet, "in the same way a meeting of the minds is necessary to create a binding contract, so also is a meeting of the minds necessary to modify the contract after it has been made." *Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 326–27 (1996) (citing *Universal Leaseway System, Inc. v. Herrud & Co.,* 366 Mich. 473, 478 (1962)). In other words, an existing contract cannot be unilaterally modified. *Bixby v. Giesy*, No. 261163, 2005 WL 1630542, at *3 (Mich. Ct. App. July 12, 2005) ("Although parties are free to modify their contract, 'the freedom to contract does not authorize a party to *unilaterally* alter an existing bilateral agreement.'") (quoting *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 372 (2003) (emphasis in original)). By the same token, a franchise is entitled to protection under the Contract Clause of the United States Constitution, article I, § 10, which bars enactment of state laws impairing the obligations of contracts. The Clause speaks of the impairment of a contract by a state, but it has been interpreted to apply to municipalities as well. *See Northern Pacific Railway Co. v. Minnesota ex rel. Duluth*, 208 U.S. 583, 590 (1908). Just the same under the Michigan Constitution. Const. 1963, art. 1, § 10 ("No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted.").

This is where the new ordinance hits its first snag. The City is of course free to enact ordinances within the limits of its Charter, which includes "regulat[ing] and prescrib[ing] from

time to time the charges and prices for the transportation of persons and property [by ferry.]" (Charter Chp. IX, § 1, part 13, ECF No. 38-6, PageID.620–21).  But it is at the same time bound by the Franchise Agreement to which it freely assented.  And that Agreement allows the City to "assert its jurisdiction over schedules and fares" *only* where "no competition is found to exist in ferry boat service to and from the City."  (ECF No. 7-4, PageID.112).  In the City's own words, "[w]hen there was competition, the City granted the ferry companies pricing autonomy because that competition protected the public interest."  (ECF No. 47, PageID.1001).  And so the City must honor that arrangement until the existing franchises expire.  *See Stackpole Int'l Eng'g, Ltd. v. Angstrom Auto. Grp. LLC*, No. 17-13748, 2018 WL 4679627, at *5 (E.D. Mich. Sept. 28, 2018) ("The [contract's] duration ends with the discharging of the parties' obligations, either by performance, termination, or breach."); *Michigan Ry. Co. v. City of Lansing*, 260 F. 322, 325 (E.D. Mich. 1919) ("[T]he franchise involved here is a contract, and it is elementary that neither the state nor any of its agencies may, by constitutional provisions or by other laws, impair the obligations of such a contract.").

The City says the 2025 Ordinance does nothing to interfere with the Franchise Agreement; it "merely clarifies the process to review proposed rate increases."  (ECF No. 38, PageID.583). But that's not true.  It affirmatively adds language giving the City Council "complete power to regulate all rates [and] fares[.]"  (ECF No. 38-19, PageID.715).  This is more an expansion of power than a clarification of process.  And it runs roughshod over the 2012 Memorandum of Understanding's statement that "[a]ll lines determine their own schedules and rates."  (ECF No. 7-4, PageID.113).  But even if the 2025 Ordinance *did* merely spell out the regulatory procedure for the Ferry Companies' service rates, that would still constitute a unilateral rewrite of the terms of the Agreement.  The 2025 Ordinance provides that "upon passage of this Ordinance, all Ferry Boat

16

Companies shall provide any and all documentation needed for the Council to review Ferry Boat Company operations, cost to provide Ferry Boat Services, annual revenues," and much more. (ECF No. 38-19, PageID.715–16).  This process creates new obligations for the franchisees that were not a part of the original Agreement.  That is a textbook breach of contract, and possibly a substantial impairment of a contractual right.  *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003) ("An impairment of a public contract is substantial if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term.") (cleaned up).

This is not an ordinance designed with deference to the existing terms of the franchise. Nowhere does it state, for example, that it does not supersede the Franchise Agreement.  In fact, the 2025 Ordinance seeks to expressly repeal and replace the previous Ferry Boat Code.  (ECF No. 38-19, PageID.709).   The 2025 Ordinance was written with the aim of supplanting the terms of the parties' negotiated deal—especially the 2012 Code incorporated into the contract—with new and inconsistent terms.  And that is not allowed under the law.  Indeed, the 2012 Code sets forth the following basis for injunctive relief: "[a] violation of any provision of this article by any person or ferry boat company is deemed to be a nuisance per se, causing irreparable harm, and shall constitute grounds for injunctive relief."  (ECF No. 36-6, PageID.490).  "Person" is defined to include a "corporation, trust, partnership, incorporated or unincorporated association, or other legal entity," which therefore includes the City.  (*Id.* at PageID.489).   Under this provision, and otherwise, the City cannot contradict the material terms of the franchise by dint of municipal lawmaking.

The only way the 2025 Ordinance's boat fare provisions gel with the Franchise Agreement is if "no competition is found to exist," permitting the City to step in to regulate fares.  (ECF No.

7-4, PageID.112).  But the City put the cart before the horse by making that decision itself.  A closer look at the text and structure of Section 9 of the Agreement suggests a different approach is necessary:

> In the event that no competition *is found to exist* in ferry boat service to and from the City, *the City has the right* to assert its jurisdiction over schedules and fares to the extent permitted by present law.

(ECF No. 7-4, PageID.112) (emphasis added).  Where the Agreement uses the passive voice and does not identify the actor in the first clause, it uses active voice and identifies the City as the actor in the second clause.  If the parties meant for the City to do the "finding," they would have said so, just as they knew to do in the second clause.  *Cf. Brickey v. McCarver*, 323 Mich. App. 639, 648 (2018) ("The Legislature's omission of a term in one portion of a statute that is contained in another should be construed as intentional.").  They did not, which suggests the parties intended for a third party, not the City itself, to make the call.

Here, the City argues that its power to determine whether there is competition among the Ferry Companies is "implicit in the Charter," which delegates to the City the power of "'keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper[.]'" (ECF No. 36, PageID.452).  But this general regulatory authority does not *ipso facto* endow the City with the power to decide a disputed point in the contract, just as the Ferry Companies are not given that exclusive right.  The most plausible answer, where the contract is silent as it is here, is for the Court or another third-party neutral to decide.  Later, the Court may wish to look beyond the four corners of the Franchise Agreement—perhaps in meeting minutes and other public records—to determine the parties' intent.  But for now, the Court is confident in finding a strong probability that *neither party* gets to decide unilaterally whether ferry boat competition exists.  Further scrutiny on the merits may demonstrate that there is "no competition," and the City is free to assert its jurisdiction over fares and rates.  But that is

18

not a question for today.  No matter the virtues of its cause, the City cannot bypass its own contract by ordaining itself arbiter of ferry boat competition.

The Court's preliminary injunction ruling is based on the parties' Franchise Agreement. Antitrust concepts of "competition," while not controlling, may help inform later decisions about Section 9 of the Agreement.  But the Court does not venture at this stage to decide the antitrust issues raised in the City's Counterclaim and the Ferry Companies' Motion to Dismiss.  From where things sit now, there are substantial grounds for concluding the City cannot demonstrate a probability of success on its antitrust claims—regardless of whether they ultimately survive Rule 12(b)(6).  The Counterclaim does not allege, for example, that the Ferry Companies have actually exercised any market power they may have in the relevant market (which is not specifically defined in the Counterclaim) (*see generally* ECF No. 7), but such claims are ordinarily essential to a Sherman Act monopolization claim (*United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) ("The offense of monopoly under Section 2 of the Sherman Act has two elements. [1] the possession of monopoly power in the relevant market and [2] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.").  And to the extent the City is trying to rely on a Sherman Act contract in restraint of trade theory, the *Copperweld* doctrine would be a significant barrier, as even the City appears to recognize by treating this theory strictly as provisional and alternative.  But the Court need not boil that ocean for purposes of the instant preliminary injunction motions.

### B.  Parking Rates

The Ferry Companies also have the better argument on the issue of parking and other ancillary services.  Although it seems to be a current flashpoint, parking has never been part of

ferry service proper.  As with the issue of fares, the Court begins its analysis here with the governing contract.  And there can be no dispute that the Franchise Agreement never once mentions parking or otherwise extends the City's regulatory power beyond the core ferry service itself.  The same is true of the Ferry Code and the City Charter.  The City asks the Court to read those powers into the Charter by way of the phrase "keeping and management of such ferries." (ECF No. 47, PageID.998–99; *see* ECF No. 36-5, PageID.477 ("The council . . . may impose such reasonable terms and restrictions in relation to the keeping and management of such ferries[.]"). "Management," it says, goes beyond "regulation" to somehow incorporate ancillary services like parking in lots outside of the City's limits.  (*Id.*).  But that dog won't hunt.  Whatever difference there is between the "management" and "regulation" of a public utility, it is not so vast as to confer unlimited authority over all aspects of that utility's operations, including its parking.  The Charter plainly empowers the City to "regulate and license ferries *from such city or any place of landing therein to the opposite shore*," meaning its jurisdiction ends at the docks—not the parking lots. (ECF No. 36-5, PageID.477) (emphasis added).  Any "keeping and management" within those bounds and consistent with the Franchise Agreement is fair game.  The rest is not.

The City takes this "landing therein to the opposite shore" language to mean parking lots too.  By the City's logic, if a water carrier's dock on shore is part of the ferry, so too is its parking lot.  (*Id.* at PageID.999 (arguing that a "ferry" extends to the landings on the shore, "like a parking lot.")).  But a "landing" is not just any land extending from the ferry's docks; it is "a place for discharging and taking on passengers and cargo."  Merriam-Webster's Collegiate Dictionary, 699 (11th ed. 2006); *see also* Landing, Black's Law Dictionary (12th ed. 2024) ("A place on a river or other navigable water for loading and unloading goods, or receiving and delivering passengers and

watercraft.").  That means a pier or a slipway—something connecting the land to the lake.  A parking lot, it is not.

It may well be that parking is, as a practical matter, part of the cost of getting to and from the Island.  But that alone does not make it a matter properly within the City's power to regulate.  The existing state law, municipal code, and franchise documents focus on ferry service to and from the Island, not ancillary services—like parking—that happen entirely outside the jurisdiction of the City.  *Cf. State ex rel. Utilities Comm'n v. Bald Head Island Transportation, Inc.*, 296 N.C. App. 199, 214 (2024) (finding parking operations subject to utility commission's regulation where state statute defined "service" to include "any ancillary service or facility used in connection with such service").  Moreover, there is no allegation here that the Ferry Companies have ever tried to leverage whatever power they may have in the ferry service market to parking.  The Ferry Companies do not, for example, insist that everyone who rides the ferry park in a ferry-owned lot.  That kind of tying arrangement might raise genuine antitrust tying concerns.  But there is nothing like that of record here.

The Ferry Companies have therefore established a likelihood of success on the merits, and the City has not.[4]

---

[4] To the extent the Ferry Companies seek temporary injunctive relief enjoining proposed Senate Bill No. 304 from taking effect, the Court will not interfere with the province of the State Legislature at this prospective and speculative stage.  Federal courts do not hold legislative veto power.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 361 (1966) (Black, J., concurring and dissenting) ("Nor does any provision in the Constitution endow the federal courts with power to participate with state legislative bodies in determining what state policies shall be enacted into law.  The judicial power to invalidate a law in a case or controversy after the law has become effective is a long way from the power to prevent a State from passing a law.").

## II.        Irreparable Harm

The second factor is whether the movant will suffer irreparable injury without the preliminary injunction.   A "plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration*, 511 F3d at 550 (quotation omitted).  In this case, the harm the Ferry Companies seek to avert—namely, an inability to remain in operation—cannot be wholly remedied by monetary damages.  But the harm the City seeks to avert can, because even if something is wrong down the road, the Court could fashion appropriate relief.  *Cf. Consumers Power Co v PSC*, 415 Mich 134, 145 (1982) (granting equitable relief to allow rates to go into effect subject to *ex post facto* refund).  The City does not have standing to step in for other customers, but there is always the possibility that it could recover its own funds, which is a relatively easy fix in retrospect.

Without an injunction, the City's new ordinance would compromise the material terms of an existing, arms-length agreement—an agreement that gives the Ferry Companies the default power to set schedules and rates.  To upend those terms risks disruption that could, at its worst, interrupt or potentially even terminate ferry service for a time.  That may mean a higher overall package price for some consumers, assuming the City would set lower rates after reviewing all the financial information it wants from the ferries.  But there is no practical way for the City to do that with the peak season already underway.  Moreover, the primary source of any package price increase above CPI adjustment is not transit fares, but parking, which is ancillary to the fundamental source of the Franchise Agreement itself.  And the risk of that harm is confined to the only consumer before the Court, the City.  Any other financial consequences are beyond the scope of the irreparable harm analysis and still pale in comparison to the harm visited by the interruption of ordinary ferry operations.

The City also claims noneconomic harm because an injunction would impede its regulatory authority, but the Court disagrees.  The City exercised its authority in entering into the Franchise Agreement, which for better or worse places limits on when it can step in to assert its jurisdiction over fares.  The Court's injunction goes no further than protecting the terms of that Agreement, so the City's regulatory authority remains quite intact.

The Ferry Companies have therefore demonstrated an imminent risk of irreparable harm, and the City has not.

### III.    Risk of Harm to Others

The balance of risk of harm also weighs in favor of a preliminary injunction enjoining implementation of the Ordinance.  In fact, an injunction is likely to protect, rather than hurt, third parties.  Continuing an uninterrupted ferry service for at least the remainder of the 2025 season will allow residents, commuters, and visitors to continue with what the City calls the "essentially one way to get to and from the island."  (ECF No. 38, PageID.562).  The risk that the Ferry Companies might shut down, or experience significant disruption, without relief from the 2025 Ordinance is far too great.  There is no alternate transit system on the Island capable of servicing the same numbers in the interim, so a *status quo* injunction is the only practical measure until the parties either reach an agreement or litigate their case on the merits.  And, again, "the ability of the plaintiffs to issue refunds substantially diminishes the harm that may befall their [passengers] if an injunction is granted, and is outweighed by the harm that may befall the plaintiffs."  *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001).

A preliminary injunction for the Ferry Companies, therefore, will not hurt third parties, but will actually serve to prevent harm that may otherwise occur in the absence of a preliminary injunction.  The same cannot be said of the City's proposed injunctive relief.

IV.     **Public Interest**

The Ferry Companies have established that the requested preliminary injunction would serve the public interest for many of the reasons already described.  It therefore benefits the public to temporarily enjoin the City's implementation of its new 2025 Ordinance.

Moreover, the entire relationship between the City and the Ferry Companies is up for re-negotiation no later than 2027, when the existing fifteen-year deal ends.  Both sides need each other, and a negotiated outcome is not only in everyone's best interest, but also the only realistic way forward.  And to the extent the 2025 Ordinance might set a precedent for the City to rewrite the terms of its existing agreements with private parties, then that public harm too is mitigated by an injunction.  *See Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987) (recognizing that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional").

Each of the four preliminary injunction factors favors the Ferry Companies' request and defeats the City's.  Granting relief for the Ferry Companies would preserve the ordinary operation of things, while granting the City's requested relief would upend the current situation of the parties and of the public.  The Court therefore concludes that the Ferry Companies are entitled to the preliminary injunction they seek, and the City is not.

V.     **Bond**

In addition to the four preliminary injunction factors, the Court must also "at least consider whether to order a bond before issuing an injunction" to comply with Federal Rule of Civil Procedure 65(c).  *Total Quality Logistics, LLC v. Traffic Tech, Inc.*, No. 22-3148/3377, 2023 WL 1777387, at *5 (6th Cir. Feb. 6, 2023) (citing *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 400–01 (6th Cir. 2012)).  The Court has searched the briefing for the City's

24

costs resulting from the Ferry Companies' newest rates, but it has not found even a rough estimate. Nor has the City requested a bond under Rule 65(c) that might offer a measure of damages incurred.  The City has supplied the Court with some examples through the declarations of residents and visitors, but that does little to pin down specific costs for the City itself.  The Court sees no more than nominal economic impact on the City itself if the Ferry Companies continue to operate under the fee arrangements disclosed last Fall for this season.  The Court therefore determines that no bond is necessary on this record.

### CONCLUSION

For thirteen years of the Franchise Agreement's fifteen-year term, the parties worked in relative harmony to provide ferry service to Mackinac Island's residents and visitors.  But Gordon Lightfoot's gales of November came to the Straits early when private equity brought the ferries under common ownership.  The City is understandably concerned about what this will mean for ferry service, but that does not empower the City to make a unilateral decision rewriting the agreed terms of a fifteen-year deal.  The Ferry Companies have shown a strong probability that neither they nor the City get to decide on their own whether there is "no competition" under the Franchise Agreement.  So until a determination on the merits, the *status quo* must stay in effect, meaning the City cannot implement its new ordinance and the Ferry Companies may continue to charge the transit rates they disclosed to the City last Fall for this operating season, as well as rates for parking that are not covered by the Franchise Agreement.

**ACCORDINGLY, IT IS ORDERED**:

1.  Plaintiff/Counter-Defendants Shepler's Inc. and Mackinac Island Ferry Company's Motion for Preliminary Injunction (ECF No. 24) is **GRANTED** to the extent consistent with this Order and is **DENIED** in all other respects.

Defendant/Counter-Plaintiff City of Mackinac Island is **PRELIMINARILY ENJOINED** during the pendency of this action from implementing its proposed and adopted Ordinance Number 629 addressing ferry boat service and services related to ferry boat service;

2.    Defendant/Counter-Plaintiff City of Mackinac Island's Motion for Preliminary Injunction (ECF No. 35) is **DENIED**.

Dated:   June 30, 2025               /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE