UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


SHEPLER'S INC., et al.,

        Plaintiffs/Counter-Defendants,

                               Case No. 2:25-cv-36

v.

                               HON. ROBERT J. JONKER

CITY OF MACKINAC ISLAND,

        Defendant/Counter-Plaintiff.

_____/


### OPINION AND ORDER

Most visitors to Mackinac Island arrive by ferry operated by one of Plaintiff Ferry Companies. Hoffman Marine acquired Shepler's in 2022 and Arnold/MIFC in 2024, bringing both ferry services under common ownership. The City of Mackinac Island says this forms the basis for antitrust and breach of contract claims against the Ferry Companies. Common ownership of the two active ferry services naturally and reasonably generates concern about the risk of anti-competitive behavior, but standing alone, it does not amount to a viable antitrust claim. For that, the City must have plausible factual allegations demonstrating that the City has antitrust standing to bring the claims in the first place, and that that the Ferry Companies have actually exercised whatever market power they have to exclude competition in the relevant market. The City has not made these assertions, which means its antitrust claims are subject to dismissal. The City's contract theory, on the other hand, plausibly alleges that the Ferry Companies breached the governing franchise agreements by failing to comply with the City's regulatory authority over fares. That does not mean the City will ultimately have a winning hand, but it does mean that its

current contract claim, unlike its antitrust claims, survives the Ferry Companies' Motion to Dismiss.

BACKGROUND

## I.    Counterclaim Allegations

On March 3, 2025, the Ferry Companies brought this action against the City, asserting one count for declaratory judgment under 28 U.S.C. § 2201.  (ECF No. 1).  The City answered the Complaint a month later and asserted its own Counterclaim against the Ferry Companies.  (ECF No. 7).  The City brings three antitrust claims under federal and state law, one claim for breach of contract for the Ferry Companies' "failure and refusal to cooperate in the City's regulatory program," and one declaratory judgment claim.  (*Id.* at PageID.82–88).

The Court outlined the facts in considerable detail in its June 30, 2025 Opinion and Order (ECF No. 50).  The Court incorporates the fact section from that decision, but expands on those facts below to emphasize the allegations central to the City's Counterclaim (ECF No. 7).

### A.    Hoffman Marine's Common Ownership of the Ferry Companies

Hoffman Marine, an unincorporated division of the Hoffman Family of Companies, purchased all or a controlling majority of Shepler's stock in 2022.[1]  (ECF No. 7, PageID.75).  In 2024, Hoffman Marine purchased all or a controlling majority of the Mackinac Island Ferry Company's ("MIFC") stock, bringing the remaining ferry companies serving Mackinac Island under common ownership.[2]  (*Id.*).  The City alleges that Hoffman Marine has maintained the two

---

[1] The Ferry Companies clarify that "Hoffman Marine" "is not an organized entity, but merely a trade name used by the Hoffman Family of Companies to encompass its separately-owned and organized maritime businesses."  (ECF No. 19, PageID.197 n.2).

[2] It appears that Hoffman Marine is rebranding its MIFC fleet under the traditional Arnold Transit Company name and colorway, and is doing business as the same.  (*See* ECF No. 1, PageID.1).  For consistency, the Court continues to refer to the ferry line as "MIFC" throughout its Order.

2

ferry lines as separate corporations, while exercising complete control over both companies, "including their boats, docks, parking lots, names, brands and pricing."  (*Id.* at PageID.76).

As evidence of this control, the City alleges that both Shepler's and MIFC report to Hoffman Marine's President, Jenny Gezella, who "on information and belief is the ultimate decision-maker for both companies."  (*Id.*).  The City attaches to its Counterclaim a July 2024 article from the Mackinac Island Town Crier that states, "If problems continue and commuters or residents are not allowed to board a Star Line ferry, Gezella announced that Star Line tickets will be accepted at Shepler's." (ECF No. 7-9, PageID.142).  The City highlights Genzella's quote from the interview, which reads, "As a family now of companies, a ticket is a ticket.  We're going to avoid this [problem of commuters not receiving priority] going forward.  If you can't get on at Star Line [MIFC], bring it over to Shepler's, and we will get you on the boat."  (*Id.*).  The article continues by quoting City Councilmember Alan Sehoyan, who responded that "[t]hose are exciting things for us."  (*Id.*).

The City further alleges that Shepler's CEO, Chris Shepler, acts or has acted as the chief operating officer of both Shepler's and MIFC, and that Gezella and Shepler have appeared together on behalf of both ferry lines "in dealing with City officials on rates and operational matters." (ECF No. 7, PageID.77).  The City says that in the summer of 2024, Hoffman Marine discontinued service for most of MIFC's boats and used Shepler's boats to transport passengers for both companies.  (*Id.*).

Section 9 of the amended franchise agreements entered into by Shepler's and MIFC includes the following language, which is central to the parties' dispute:

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

(ECF Nos. 7-4, PageID.112, 7-6, PageID.130).  The City says there is "no competition" under this provision, alleging that Shepler's and MIFC "are not competitors as a matter of fact and law" because they are under the common ownership and control of Hoffman Marine.  (ECF No. 7, PageID.78).  The City alleges that it is therefore empowered under the Franchise Agreement, the City Charter, and the Ferry Boat Code, to regulate the Ferry Companies' rates and charges— including those for parking in company-owned lots.  (*Id.*).  On this basis, the City Council "declined to approve" the Ferry Companies' fare increases in late 2024, pending enactment of an updated ordinance incorporating a procedure for rate regulation.  (*Id.* at PageID.78–79).  The Court has since enjoined the City from implementing its proposed and adopted Ordinance Number 629 because the Court found a probability of success on the Ferry Companies' claim that the City lacks the unilateral power to make the "no competition" call.  (ECF Nos. 50, 51).

### B.    Parking

The City's remaining allegations relate to the Ferry Companies' parking rates.  Because there is no public transit in Mackinaw City of St. Ignace (the two port cities connecting ferry passengers to Mackinac Island), the City alleges that most ferry passengers must arrive at the docks by private vehicle.  (ECF No. 7, PageID.79).  The City says the Ferry Companies own "extensive parking lots" in the mainland cities.  (*Id.*).  According to a June 29, 2024 Hoffman press release attached to the City's Counterclaim, the Hoffman Family of Companies owns "more than 116 parcels of land, including docks in Mackinaw City, Mackinac Island, and St. Ignace, 51 buildings and 6500 parking spaces." (*Id.*).  The City alleges that there are "no competing public or privately-owned parking lots in or near Mackinaw City or St. Ignace that ferry passengers could use," and that street and business parking is limited in both cities.  (*Id.*).  The City concedes that a competitor could develop additional remote parking lots, but says there are "substantial barriers to entry," like

zoning approval and dock access.  (*Id.* at PageID.80).  Among these barriers, alleges the City, is the Ferry Companies' common control of and exclusive access to the ferry docks.  (*Id.*).

The City alleges that ferry service is an "essential facility" for the City and its residents, visitors, businesses, and employees.  (*Id.*).  And before the Ferry Companies came under common ownership, says the City, parking was effectively bundled with the cost of a ferry ticket and was free to Island residents and seasonal employees.  (*Id.*).  Since Hoffman's acquisition, however, the Ferry Companies have imposed parking charges of at least $10 per day, with higher rates for overnight and premium parking options.  (*Id.*).  The City says the Ferry Companies have also announced plans to charge Island residents and commuters hundreds of dollars for annual or seasonal parking passes.  (*Id.* at PageID.81).

According to the City, these parking rate hikes are an end-run around fare regulation.  (*Id.*).  And because parking is "necessary to access the ferries," says the City, "it is an integral part of transportation" and is thus subject to regulation under the Franchise Agreement, the City Charter, and the Ferry Boat Code.  (*Id.*).  Despite this, the Ferry Companies have not submitted proposed parking fees for the 2025 season for City approval.  (*Id.*).  The City alleges that the Ferry Companies' parking rates have caused the City and others irreparable injury, and that the Ferry Companies' control over the docks has allowed them to "extract monopoly profits" from the relevant market.  (*Id.*).  The City further alleges that it "is injured in its business or property by the ferry boat companies' antitrust violations and breaches of contract alleged herein."  (*Id.*).  Because the City is a customer of the Ferry Companies, it alleges that the "supra-competitive rates and charges" have increased the City's costs and suppressed its revenues "by discouraging travel to Mackinac Island."  (*Id.* at PageID.81–82).

## II.    Procedural Posture

On May 19, 2025, the Ferry Companies moved to dismiss the City's Counterclaim under Rules 12(b)(1) and (6).  (ECF No. 18).  In their Motion to Dismiss, the Ferry Companies contend that the City lacks Article III and antitrust standing and has failed to plead the requisite elements of its antitrust claims.  (ECF No. 19).  They also argue that the Franchise Agreement does not give the City authority to unilaterally declare "no competition" under Section 9, and that it contains no language giving the City the right to regulate ancillary services like parking, priority boarding, or luggage.  (*Id.*).  The Court heard argument on these issues at the initial Rule 16 conference in Marquette on May 28, 2025.  (*See* ECF No. 28).  The motion has since been fully briefed and is ripe for decision without further argument.

### LEGAL STANDARDS

In considering a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff; accepts as true the plaintiff's factual allegations; and determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court uses the same standard to evaluate a counterclaim as it uses to evaluate the sufficiency of the complaint itself.  *See Baxter Bailey & Assocs., Inc. v. Powers & Stinson, Inc.*, 2015 WL 13091368, at *2 (W.D. Tenn. Jul. 10, 2015); *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014) ("[Rule 12(b)] applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.").  To survive, a counterclaim must allege sufficient facts to "raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual conduct that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the [counter]complaint . . . has not shown that the pleader is entitled to relief."  *Id*. at 679 (quoting FED. R. CIV. P. 8(a)(2)).  No heightened pleading requirements apply in antitrust cases. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

DISCUSSION

The Counterclaim's antitrust theories suffer both threshold and more fundamental pleading defects that the City may or may not be able to remedy by amendment.  But its breach of contract theory is on solid Rule 8 ground.

## I.    Antitrust Claims

The City's first antitrust count is really two claims: one for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and one for contract in restraint of trade under Section 1 of the same Act, 15 U.S.C. § 1.  (ECF No. 7, PageID.82).  The City alleges that the Ferry Companies exercise monopoly power over the relevant market for ferry service to Mackinac Island.  (*Id.*).  It defines the relevant market by alleging, "[f]erry service to Mackinac Island constitutes a relevant product and geographic market for the purposes of the antitrust laws." (*Id.*).  The City claims that the Ferry Companies' control over the mainland parking lots acts as a barrier to entry in the relevant market and enables the Ferry Companies to "extract monopoly profits from the relevant market."  (*Id.*).  In the alternative, the City alleges that the Ferry Companies exercise monopoly power over "parking necessary to use the ferries."  (*Id.*).  Finally, the City claims that Hoffman Marine's acquisition, operation, and control of the Ferry Companies operates as a contract, combination, or conspiracy in restraint of trade.  (*Id.* at PageID.83).

7

For its second and alternative antitrust claim, the City contends that, if the Ferry Companies are independent companies, their coordination on rates and terms of service is a conspiracy to fix prices and divide markets. (*Id.*). The City's final antitrust claim appears to state the same theories under the Michigan analogue. (*Id.* at PageID.84). The City also asks the Court for declaratory relief with respect to each of its antitrust theories. (*Id.* at PageID.86–87).

### A.    Antitrust Standing[3]

The Ferry Companies argue that the City fails to plead an antitrust injury. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law . . . ." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). The purpose of the inquiry is to ensure that recovery is confined to cases where consumers will receive the benefits of a competitive market, consistent with congressional intent. *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989). An antitrust injury is a "necessary, but not always sufficient" condition of antitrust standing. *NicSand*, 507 F.3d at 450. "An antitrust claimant must show more than merely an 'injury causally linked' to a competitive practice; it 'must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

"'The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is itself not an antitrust violation.'" *Ky.*

---

[3] Antitrust standing is more of a statutory issue than a question of constitutional Article III standing. The Ferry Companies challenge the City's Article III standing too, but the Court has no difficulty finding the City has plausibly alleged an injury-in-fact connected to the operation of the ferries under common ownership that could be redressed by the Court, either under a contract theory or a properly pleaded antitrust theory. Nothing more is necessary for Article III standing.

*Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.,* 588 F.3d 908, 920 (6th Cir. 2010) (quoting *Valley Prods., Inc. v. Landmark,* 128 F.3d 398, 403 (6th Cir. 1997)).  To recover damages under the Sherman Act, the claimant must establish an antitrust injury such that (1) the alleged violation tends to reduce competition in some market and (2) the claimant's injury would result from a decrease in that competition, rather than from some other consequence of the defendant's actions.  *Conwood Co., LP v. United States Tobacco Co.,* 290 F.3d 768, 788 (6th Cir. 2002).

The Court agrees with the Ferry Companies that the City has not adequately established antitrust standing under Sixth Circuit authority.  There are no facts in the Counterclaim suggesting the actual or attempted exclusion of competitors—only claims that the parking lots controlled by the Ferry Companies "act as barriers to entry into the relevant market."  (ECF No. 7, PageID.82).  This does not amount to exclusionary or anticompetitive behavior or intent, particularly when paired with the City's concession that "competitors could develop additional remote parking lots[.]"  (*Id.* at PageID.80).  In the broader context of a non-exclusive ferry franchise, ownership of mainland parking lots—without any targeted tactics to stifle competition—does not establish the requisite anticompetitive conduct from which the City's injury must flow.  Nor does market share alone clear the hurdle.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) ("[T]he acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct").  The City must offer more than summary allegations of market dominance to establish antitrust standing.

Beyond that, each of the City's antitrust claims turns on the Ferry Companies' control over parking.  So on the primary theory that ferry service is the relevant product (*see* ECF No. 7, PageID.82), the City fails to properly connect its injury as ferry customer to any anticompetitive conduct—all of which seems to flow from parking.  To do so, the City would need to claim some

sort of tying arrangement by which the Ferry Companies exploit their power over ferry service (the tying product) to force the City to accept parking (the tied product).  That is not alleged here.  So too for the alternative theory that "parking necessary to use the ferries" is the relevant product (*see id.*).  In its current form, the Counterclaim describes parking as a practical necessity to access the ferries.  While that may be the case for many ferry passengers, "practical necessity" is not enough to raise antitrust concerns; there must be an express refusal to sell the tying product without the tied product.  *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992).  In that respect, the City must introduce a tying element to plausibly allege parking as the relevant product too.  So, outside of materially altering its theories of recovery, the City must claim to have suffered an antitrust injury as a result of a tying arrangement.  Otherwise, the City's injury bears no direct relation to the anticompetitive conduct, meaning the City does not occupy the right market position to bring these claims.

### B.  Relevant Market

It is also difficult for the Court to meaningfully evaluate the effect of the Ferry Companies' conduct without understanding the nature of the relevant product and geographic market.  *F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 447, 460–61 (1986) ("The purpose of identifying the market definition and market power is to determine whether the alleged anticompetitive acts are likely to adversely affect competition.").  Claims brought under Section 1 or 2 of the Sherman Act require a definition of the relevant market.  For Section 2, a market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand.  *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95 (1956).  In other words, the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market.  *See Exxon Corp.*, 275 F.3d

10

at 201–02.  Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.  *Id.* at 200.

The City's only allusions to the relevant market are that "[f]erry service to Mackinac Island constitutes a relevant product and geographic market" (ECF No. 7, PageID.82), and, alternatively, that "parking necessary to use the ferries is a relevant product and geographic market" (*id.*).  The boundaries of these markets—on both product and geographic dimensions—are not sufficiently defined.  On these facts, what unique attributes can the Court ascribe to ferry service or to parking? How viable are substitutes like private boats,[4] street parking, or local residents offering parking on their private property?  What about a possible new ferry service through Plaunt Transportation, which already operates a ferry from Cheboygan, Michigan to Bois Blanc Island, Mackinac Island's near neighbor?  (*See* PLAUNT TRANSPORTATION, https://plaunttransportation.com/ [https://perma.cc/C32T-B86C] (last visited July 31, 2025)).  Without more, it is difficult to know whether "ferry service to Mackinac Island," for example, is too narrow a relevant product market. Consider also the alternative of biking to the docks over parking in a lot—a substitute more likely for commuters than out-of-towners.  How does the price of bringing a bicycle aboard factor into a passenger's calculation?  This is all relevant in determining how competition and potential competition constrains the Ferry Companies' market power.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992) ("The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their

---

[4] Uber and Lyft completely disrupted established taxi service for ground transportation.  It is not implausible to imagine a similar market disruption in other forms of transportation.

consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'").  But these allegations are absent from the City's Counterclaim.

Neither does the City define the geographic scope of the relevant markets.  A pleading may be dismissed when the geographic market is insufficiently pleaded or would be totally unsupportable.  *Mich. Div. Monument Builders of North America v. Mich. Cemetery Ass'n,* 524 F.3d 726, 733 (6th Cir. 2008).  Here, though the allegations don't say it, the Court can infer that the relevant ferry market comprises Cheboygan, Emmet, and Mackinac Counties, because these are the only geographic areas in which the Ferry Companies operate.  But the Court cannot connect the same dots when it comes to the parking market; nor should it have to.  There is no attempt in the Counterclaim to distinguish the Ferry Companies' lots from others, or to explain whether any parking substitutes exist outside of the area where the Ferry Companies keep their lots.  *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) ("A geographic market is defined as an area of effective competition.") (internal citations and quotation marks omitted).  Even employing some of the same guesswork here only takes the Court so far, because the Counterclaim simply fails to describe any geographic boundary for the relevant market.  To advance its antitrust claims any further, the City will need to replead them with a greater degree of specificity than what it has provided here.  *See Smartrend Mfg. Grp. (Smg), Inc. v. Opti-Luxx, Inc.*, No. 1:21-CV-1009, 2023 WL 6304912, at *30 (W.D. Mich. Sept. 28, 2023) (dismissing antitrust counterclaim because the Court was left "with no clues as to the geographic scope of the alleged market," among other reasons).

Moreover, the City needs to put forth distinct market definitions for both the parking and ferry products to establish a cognizable tying claim.  The market for parking is necessarily going to look quite different from the market for ferry service.  So the City must add enough color to its

allegations for the Ferry Companies and the Court to understand the basic, articulable differences between the two markets in play.

### C.    Section 2: Monopolization

The threshold problems of antitrust standing bleed into the core elements of the antitrust claims.  For these and other reasons described below, each of the three antitrust counts must be dismissed.[5]

A monopolization claim requires a plaintiff to show that a defendant has "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992).  Monopoly power is defined as the "power to control prices or exclude competition."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citation omitted).  There must be a general intent on the part of the defendant to exclude others from the market.  *Id.*  Such exclusion that is not the result of business efficiency is always deliberately intended.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (citation omitted).  In determining whether conduct may be characterized as exclusionary, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way."  *Id.* at 605.  "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory."  *Id.* (internal quotation omitted).

---

[5] "[B]ecause the legal requirements of the Michigan antitrust statute mirror those of its federal cousin," the Court dismisses Count III for the same reasons it dismisses Counts I and II.  *Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 684 (6th Cir. 2016).

Although the City has pleaded some of the ingredients of a monopoly power, it is far from a lay-down hand.  There is no dispute that the Ferry Companies are the only two ferry lines currently operating to and from Mackinac Island.  Nor is there dispute that those ferry lines are under the common ownership and control of Hoffman Marine.  But it is also true that the Franchise Agreement governing the Ferry Companies' service to and from Mackinac Island establishes a "nonexclusive ferryboat franchise," so query whether the Ferry Companies hold the power to exclude competition.  (ECF No. 7-4, PageID.108).  The City does allege that the Ferry Companies maintain control over the key docks and parking lots, but it also concedes that new market entrants could develop around the existing infrastructure.  (ECF No. 7, PageID.80).  Again, what about a possible new entrant like Plaunt Transportation, which is already providing ferry service in the same waters to Bois Blanc Island?  Plus, the Franchise Agreement gives the City the power to "assert its jurisdiction over schedules and fares" if "no competition is found to exist in ferry boat service to and from the City."  (ECF No. 7-4, PageID.112).  In practical terms, of course, the Ferry Companies hold temporary sway over prices while the "no competition" question remains the undecided subject of this litigation.  But that power is limited by the express terms of a contract— a contract that is due to expire in less than two years, at that.  So the City will need more than it has alleged so far to state a plausible case of monopoly power.  And, in any case, the Court cannot properly evaluate monopoly power without a proper definition of the relevant market over which the Ferry Companies are said to have control.

The City also fails to sufficiently allege that the Ferry Companies have a general intent to exclude competitors from the market.  Most notably, the City has alleged that the Ferry Companies own and control many of the mainland parking lots, and enjoy "exclusive access to the docks necessary for use by the ferries[.]"  (ECF No. 7, PageID.79–80).  This is alleged as a byproduct of

14

Hoffman Marine's acquisitions of the two remaining ferry operators, and not as an affirmative attempt to wall off competition.  (*See id.* at PageID.79 ("The June 29, 2024, HFC Press Release stated that with the acquisition of MIFC/Arnold, 'HF Companies now owns more than 116 parcels of land, including docks in Mackinaw City, Mackinac Island, and St. Ignace, 51 buildings and 6500 parking spaces.'") (emphasis in original); ECF No. 40, PageID.742 ("They did not acquire monopoly power [as a consequence of anticompetitive tactics], but through Hoffman's willful acquisitions of the companies.").  Anticompetitive intent cannot be inferred from the acquisitions alone, for the mere act of gaining market share does not give rise to an assertion of market power. *See Broadcom*, 501 F.3d at 308; *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'") (quoting *Grinnell Corp.*, 384 U.S. at 570–71).

Nowhere in its Counterclaim does the City allege the sort of exclusionary conduct proscribed by Section 2 of the Sherman Act.  In this context, that would include something like refusing to entertain shared dock access with a potential rival, or purchasing all land in and around the docks so that no competitor could develop parking lots.  That is not alleged.  Indeed, many of the "barriers to entry" the City cites—including zoning laws and development costs—exist naturally and notwithstanding any acts of the Ferry Companies.  The Counterclaim accordingly fails to state a claim for monopolization under Section 2 of the Sherman Act.[6]

---

[6] The Ferry Companies also ask the Court to dismiss the federal antitrust claims for failure to allege an interstate nexus.  (ECF No. 19, PageID.212).  But even though the Ferry Companies' activity is itself confined to Michigan, it nevertheless has an effect on other appreciable activity demonstrably in interstate commerce—namely, the online purchase of ferry tickets and tourist travel across state lines.  *See McClain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242

### D.    Section One: Contract in Restraint of Trade and Price Fixing

As the Court previewed in its preliminary injunction Order, the *Copperweld* doctrine alone precludes the City's remaining antitrust theories, which are alleged in the alternative under Counts I and II.  As the City itself argues, under *Copperweld*, the Ferry Companies "are a single entity as a matter of law" (ECF No. 40, PageID.757):

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of §1 of the Sherman Act.  A parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.  They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.  With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).  In other words, entities with a "unity of purpose or a common design" due to their ownership or control cannot be held to "conspire" within the meaning of Section 1 of the Sherman Act, such that any agreement or coordination between them cannot lead to liability.  *Id.* at 752.  *Copperweld* and its progeny, including *American Needle*, take a substance-over-form approach to the "single entity" analysis.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) ("'substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1.'") (quoting *Copperweld*, 467 U.S. at 773 n.21).  The test is therefore whether the Ferry Companies are "separate economic actors pursuing separate economic interests," such that their agreement "'deprives the marketplace of independent centers of decisionmaking,' . . . and thus of actual or potential competition."  *Id.* at 195 (quoting *Copperweld*, 467 U.S. at 769).

---

(1980).  Moreover, the Ferry Companies initially invoked this Court's subject matter jurisdiction in admiralty, which itself roots in the federal interest in navigable waters that obviously affect interstate commerce.  There is no lack of interstate nexus.

The City's Counterclaim makes no bones about the Ferry Companies' unity of interest and single center of decisionmaking.  Relevant allegations include that Hoffman Marine purchased the two remaining ferry lines servicing Mackinac Island (ECF No. 7, PageID.75); that Hoffman Marine "exercises complete control over both companies, including their boats, docks, parking lots, names, brands and pricing" (*id.* at PageID.76); and that Hoffman Marine's president oversees both ferry operations as the "ultimate decision-maker for both companies" (*id.*).  Unlike NFL teams competing in the market for contracts and intellectual property, garnering their own economic benefits separate and apart from the parent enterprise (*Am. Needle*, 560 U.S. at 196–97), the Ferry Companies operate under identical franchise agreements in service of the collective economic mission of their private equity owner.  The City even alleges that Shepler's accepted Star Line tickets for a period of time.  (ECF No. 7, PageID.77).  On the City's own telling, then, the Ferry Companies' economic incentives are most certainly aligned.[7]

The City has decidedly pleaded a single corporate consciousness across the Ferry Companies.  And while it was free to plead alternative theories of recovery, those theories cannot stand in the face of plainly contradictory factual allegations.  *See Roller v. Litton Loan Servicing*, No. 10-13847, 2011 WL 2490597, at *5 (E.D. Mich. June 21, 2011) (plaintiffs failed to state "plausible" claim under *Twombly* standard where complaint "alleges materially contradictory facts that cause all Plaintiffs' other claims to fail on the pleadings").  Therefore, the City's antitrust claims asserted under Section 1 of the Sherman Act are precluded by the City's own pleading.

---

[7] Public meeting minutes of which the Court takes judicial notice confirm that even the City Council advocated for transferrable tickets across the two ferry lines.  *See* Oct. 2, 2024 Regular City Council Meeting at 3 ("Councilwoman Myers suggested starting to look [into] the transfer of Shepler's to Arnold Transit tickets for those who previously bought larger amounts of commuter tickets and such.").

## II.        Breach of Contract

The Ferry Companies also move to dismiss the City's breach of contract counterclaim.  The City's contract theory is diametrically opposite the Ferry Companies': it claims that the Franchise Agreement, read with the City Charter, gives the City the right to determine whether "competition" exists in ferry boat service.  And because the City properly exercised that right in finding no ferry competition, the argument goes, the Ferry Companies are in breach for refusing to implement the City's rate freeze.  The Ferry Companies move to dismiss the counterclaim because the Franchise Agreement gives neither party the unilateral right to determine whether ferry competition exists. The Court has already concluded in its earlier opinion that the Ferry Companies have the better of this argument for purposes of weighing the Rule 65 preliminary injunction factors, but that is not the same thing as saying the City lacks a plausible contractual theory.

The disputed provision, Section 9 of the Franchise Agreement, memorializes an agreement between the parties that the City may step in to regulate ferry schedules and fares only when competition in ferry boat service ceases.  The Section provides:

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

(ECF No. 7-4, PageID.112).  The uncertainty over the decisionmaker flows from the passive "is found to exist" language in the first clause.  Who does the finding: the City or someone else?  The Court must interpret and apply this part of the Agreement to settle the parties' dispute.  A contract "must be interpreted according to its plain and ordinary meaning."  *Ajax Paving Indus., Inc. v. Vanopdenbosch Const. Co.*, 289 Mich. App. 639, 644 (2010).  "[W]here the terms of a contract are unambiguous, their construction is for the court to determine as a matter of law . . . and the plain meaning of the terms may not be impeached with extrinsic evidence."  *Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599, 604 (1997) (citations omitted).  In contrast, where terms are

18

ambiguous and subject to more than one interpretation, a trial court may consider parol evidence in ascertaining the parties' intent. *Id.* at 607–08.

Each side claims its own reading of Section 9 is unambiguously correct. (*See* ECF No. 19, PageID.219; ECF No. 40, PageID.753).    Their competing views are each plausible, yet diametrically opposed to one another, thus demonstrating the provision is anything but unambiguous.  The City's argument here takes two tacks.  First, the City claims that its power to decide the "competition" question is "implicit in the Charter," which the Franchise Agreement incorporates by reference.  (ECF No. 40, PageID.755).  And because the Charter delegates to the City the power of "keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper," the City says it is the natural decision-making authority under Section 9.  (ECF No. 38-6, PageID.626).  Second, the City points out that the plain text of Section 9 does not delegate authority to any third party to determine whether competition exists.  (ECF No. 40, PageID.755–56).  The City says this silence—read with the Charter—can only be interpreted as endowing the City with the power to decide whether ferry competition exists.  (*Id.*).

The City's reading makes some sense.  It is true that the Franchise Agreement incorporates the Charter by reference, and that the Charter grants the City regulatory authority over ferry boat transport.  And the parties certainly could have expressly mentioned a third-party neutral in the text of Section 9 if that was their intent.  It is conceivable, then, that the parties simply assumed the City would be the one to decide whether ferry boat competition exists.  But "conceivable" is a long way from "unambiguous."  Some of the same factors supporting the City's reading also work against it.  The parties did not designate a third party as the actor in the clause, but they did not designate the City either.  This omission is especially relevant where the very next clause expressly

19

names the City as the actor.  (ECF No. 7-4, PageID.112 ("the City has the right to assert its jurisdiction")); *Cf. Brickey v. McCarver*, 323 Mich. App. 639, 648 (2018) ("The Legislature's omission of a term in one portion of a statute that is contained in another should be construed as intentional.").  So the City's might be a plausible interpretation, but it is not the only one.

Indeed, the Ferry Companies also hold a compelling view.  They argue that a third-party determination is the default where the contract is silent on threshold questions such as this.  (ECF No. 48, PageID.1022–23).  That's certainly the case in other contexts.  Questions of arbitrability, for example, are presumed left to the courts "unless the parties clearly and unmistakably provide otherwise." *McGee v. Armstrong*, 941 F.3d 859, 865–66 (6th Cir. 2019) (internal quotation marks and citations omitted).  The same could be presumed here, where the contract fails to provide the parties with any meaningful guidance.  Section 9 does not specify a procedure or standard for determining "no competition," nor does it establish an appeal process.  As the Court has already shown, even assuming the standard is the same as the Sherman Act's view of monopoly power, the City has yet to articulate a plausible theory meeting that test.  Moreover, the "no competition" standard may mean something different than the antitrust standard, such as simply the absence of consumer choice.  Given the uncertainties, the structure of formal judicial proceedings to resolve disputes may necessarily be part of the Agreement.  The presence of two plausible and competing constructions of Section 9 is enough reason to deny the Ferry Companies' Motion to Dismiss the contract claim on the pleadings.

## CONCLUSION

When a critical service comes under common ownership, there are undoubtedly questions worth raising.  The City's Counterclaim brings those questions to the fore, including a plausible breach of contract theory.  But the City has not yet stated a viable antitrust claim.  A repleaded

version might pass muster; it might not.  The Court therefore dismisses the City's antitrust claims with leave to amend.

   **ACCORDINGLY, IT IS ORDERED**:

1. Plaintiff/Counter-Defendants Shepler's Inc. and Mackinac Island Ferry Company's Motion to Dismiss Counterclaim (ECF No. 18) is **GRANTED** as to Counts I through III, but **DENIED** as to Counts IV and V.  Counts I through III are dismissed.

2. Defendant/Counter-Plaintiff City of Mackinac Island may file amended antitrust claims not later than **August 29, 2025**.

Dated: July 31, 2025    /s/ Robert J. Jonker
           ROBERT J. JONKER
           UNITED STATES DISTRICT JUDGE