UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHEPLER'S INC., et al.,

               Plaintiffs/Counter-Defendants,

v.

CITY OF MACKINAC ISLAND,

               Defendant/Counter-Plaintiff.

_____ /

Case No. 2:25-cv-36

HON. ROBERT J. JONKER

## <u>OPINION AND ORDER</u>

Every summer, over one million tourists flock to the quaint streets of Mackinac Island. Most reach the Island by boat. For years, two ferry companies—Shepler's and Arnold Transit Company ("the Ferry-Companies")—provided the lion's share of shuttle service to and from the Island. They still do, but since 2024, they do so under the common ownership of Hoffman Family Companies ("Hoffman")—a private equity firm. The City of Mackinac Island ("the City") thinks that the current arrangement violates antitrust laws and also triggers the City's unilateral power to set fares under Section 9 of the Franchise Agreements it has with each Ferry Company.

This Order addresses only the antitrust issues. The Franchise Agreement issues are moving toward dispositive motion practice and trial in this Court and awaiting the outcome of an appeal on a preliminary injunction. The Court has already dismissed the City's antitrust claims once. This time, the City reasserts claims against the Ferry-Companies and also moves to add Hoffman as a party to the suit. However, the City's new allegations fail to cure a fundamental defect present in the City's original counterclaims: namely, that the City lacks standing to bring

1

any antitrust claims. Accordingly, the Court grants the Ferry-Companies' Motion to Dismiss the City's First Amended Counterclaim and denies the City's Motion to Join Hoffman as a party.

The disputes between the Ferry-Companies and the City can and should be resolved under the Franchise Agreements that govern their relationship for the next two seasons. They have a common interest in reliable and reasonable ferry service to over a million tourists each season. One would hope that common interest is enough to forge a sensible resolution for the next two seasons, as well as for the seasons coming after 2027 when the current Agreements expire.

### FACTUAL BACKGROUND

The Court has outlined the facts of this case in considerable detail on two sperate occasions. (ECF Nos. 50, 58). As before, the Court incorporates the facts from those decisions but also provides an overview of them here. The remaining fact section emphasizes the factual allegations central to the City's antitrust counterclaims.

### I.        Overview of the Dispute

Mackinac Island is a special place. Located in the Staits of Mackinac between Michigan's upper and lower peninsula, the Island boasts a summer resort community that attracts tourists from around the world. (ECF No. 63, PageID.1106). Adding to the Island's unique nature, Michigan—by special legislation in 1899 ("the Charter")—established the City of Mackinac Island and granted it distinct regulatory authority over the Island. (*Id.* at PageID.1107). As a summer resort town, the City maintains a population of approximately 583 year-round residents. (*Id.*).

Because there is no bridge connecting Mackinac Island to Michigan's mainland, tourists and residents typically reach the Island by ferry. (*Id.*). Because ferry service is necessary for the Island's continued operations, the Charter granted the City some authority to regulate ferry

service to and from the Island. (*Id.*).[1] Under its Charter authority, the City passed an ordinance in 1977 that requires ferry operators to first obtain a franchise from the City before offering service to and from the Island. (*Id.* at PageID.1108).

For many years, multiple ferry companies—Shepler's, Arnold Transit Company, and Star Line—provided ferry service from Mackinac City and St. Ignace to Mackinac Island. (ECF No. 60, PageID.1109). Each company had separate owners. In 2012, each of these three companies entered into similar Franchise Agreements with the City, as required by the 1977 ordinance. (*Id.*). As part of the agreement, the Ferry-Companies agreed to split a $50,000 month fee (adjusted every year for CPI) payable to the City. (*Id.* at PageID.1128). And, among other things, Section 9 of the Franchise Agreements allowed the City "to assert its jurisdiction over schedules and fares" if "no competition is found to exist in ferry boat service to and from the City." (ECF No. 63-1, PageID.1156). In 2016, Star Line purchased Arnold Transit Company and rebranded it as "Mackinac Island Ferry Company" ("MIFC"), meaning only two companies—Shepler's and MIFC—provided ferry service to Mackinac Island. (ECF No. 63, PageID.1110).

More recently, Hoffman Family Companies—a private equity firm consisting of over 100 global brands—entered the picture. In 2022, Hoffman purchased "all or a controlling majority of Shepler's stock." (*Id.*).[2] Then, in June 2024, Hoffman purchased MIFC, which it subsequently rebranded as Arnold Transit Company. (*Id.* at PageID.1111). After the purchase, Hoffman owned

---

[1] Under the Charter, the City has the power to "pass such ordinances . . . to establish or authorize, license and regulate ferries to and from the City . . . and to regulate from time to time the charges and prices for the transportation of persons . . . ." (ECF No. 63, PageID.1107-08). Further, the City also "may regulate and license ferries . . . and may require the payment of such reasonable sum for such license as to the council shall seem proper and may impose such reasonable terms and restrictions in relation to keeping in management of such ferries and the time, manner and rates of carriage and transportation of persons and property . . . ." (*Id.* at PageID.1108).
[2] After that purchase, in late 2023, the City entered into an Amendment and Restatement of Franchise Agreement with both Shepler's and MIFC that is set to expire in June, 2027. (*Id.* at PageID.1109).

both Shepler's and Arnold Transit Company ("the Ferry-Companies"). They continued to operate as separate brands in the market, as even the City recognizes by alleging that "Hoffman has maintained the Hoffman Ferry Companies as separate corporations." (*Id.* at PageID.1112). But the City also alleges that the companies' conduct shows that "they are owned and managed as one single ferry business." (*Id.*). For example, both Ferry-Companies allegedly report to Jenny Gezella, Hoffman Marine's President. (*Id.* at PageID.1116). On multiple occasions, Shepler's CEO Chris Shepler has allegedly stated that the Ferry-Companies are "all one company" and "a single franchise." (*Id.* at PageID.1114). And, at one point, Ms. Gezella allegedly said, "Star Line tickets will be accepted at Shepler's. As a family of companies, a ticket is a ticket . . . If you cannot get on at Star Line, bring it over to Shepler's, and we will get you on the boat." (*Id.*).

In December 2024, the City determined that Hoffman's acquisition of the Ferry-Companies eliminated ferry service competition within the meaning of Section 9 of the Franchise Agreement and passed an ordinance reflecting that finding. (ECF No. 63-15). Subsequently, the City, through another ordinance, attempted to regulate the Ferry-Companies' rates under its Section 9 authority. (ECF No. 63-16). Through this ordinance, the City intended to "spell[] out the procedure for the City's . . . regulation of the ferry services serving Mackinac Island." (ECF No. 63, PageID.1116). The Ferry-Companies have not complied with this ordinance and believe it operates as a breach of the Franchise Agreements. (ECF No. 1). Regardless of who ultimately prevails on that issue, the Franchise Agreements expire by their terms next year, meaning that the parties must negotiate new terms very soon or risk disrupting ferry service to the Island.

## II.    Allegations Related to the Alleged Monopoly Markets

The City asserts that Hoffman's acquisitions resulted in a monopoly power in two separate markets: (1) ferry transportation service to and from Mackinac Island, and (2) long-term parking service for ferry transportation to the Island.

### 1. Ferry Service

According to the City, "[f]or 90% to 95% of the residents and visitors, ferry boats are the normal means of transportation to and from Mackinac Island."[3] (ECF No. 63, PageID.1118). Currently, ferry service to Mackinac Island is available only from Mackinac City or St. Ignace. (*Id.* at PageID.1119). According to the City, "there is no ferry service to and from Mackinac Island from any other location in Michigan." (*Id.*). For that reason, the City alleges that after Hoffman acquired the Ferry-Companies, it controlled 90% to 95% of the market for transportation services, and 100% of the market for ferry transportation services. (*Id.* at PageID.1117).

In late 2024, after Hoffman acquired the Ferry-Companies, the Ferry-Companies "raised their ferry ticket prices by $2.00" for the 2025 season. (*Id.* at PageID.1113). According to the City, the Ferry-Companies' rates are "2-4 times higher than the rates of any other ferry services operating in Michigan." (*Id.* at PageID.1129). It is not clear what comparables the City is using for this assessment. The Court also has previously observed that these fare increases are less than the CPI increases over the same period. (ECF No. 50, PageID.1039).

---

[3] The City notes that tourists and residents can access the Island by other means. (*Id.* at PageID.1120-21). For example, tourists can reach the Island by flying on a private plane, charter plane, or taxi plane. (*Id.*). But, according to the City, these are not "reasonable alternatives" to ferry service because they would serve fewer people (i.e. the largest plane that can land at the airport on Mackinac Island is a 9-passenger plane) and cost more. A one-way ticket on a taxi plane currently costs $58. (*Id.* at PageID.1120-21). Ferry boat prices range from a low of $25 (child round trip) to a high of $52.00 (adult priority boarding round trip). *See Summer Rates*, ARNOLD TRANSIT CO., https://www.arnoldtransitcompany.com/summer-ferry-rates/; *Ticket Options*, SHEPLER'S, https://www.sheplersferry.com/ticket-options/#1593717019109-0f251d18-f0b7.

The City alleges that if other entities wish to offer ferry services to the Island, numerous obstacles stand in their way. First, the Ferry-Companies allegedly "own or have exclusive access to the docks necessary for use by ferries in St. Ignace, Mackinaw City, and the City of Mackinac Island." (*Id.* at PageID.1125). If another company were to enter the picture, either the Ferry-Companies would need to let the company "share their docks" or the mainland cities would need to develop new ones. (*Id.*). Second, new ferry entrants would have to deal with the practical logistics of finding long term parking for customers. (*Id.* at PageID.1126). Finally, the City asserts that, under the 1977 ordinance, a new ferry operator would need to obtain a franchise agreement from the City before operating. (*Id.* at PageID.1128). And the ferry service would need to split the yearly franchise fee with the Ferry-Companies, which is now $821,664. (*Id.*). The City makes no allegations about practical barriers to entry or expansion for other common carriers, such as air taxi services currently operating.

## 2.  Parking

The City also alleges that Hoffman's acquisition of the Ferry-Companies resulted in a monopoly—roughly 80-85% market share—over the long-term parking market in and around Mackinac City and St. Ignace. (*Id.* at PageID.1129). The City defines long-term parking as 3 to 4 hours or more. Per the City, the Ferry-Companies own "extensive parking lots" in the mainland cities. (*Id.* at PageID.1126). According to a June 29, 2024, Hoffman press release attached to the City's Amended Counterclaim, Hoffman owns "more than 116 parcels of land, including docks in Mackinaw City, Mackinac Island, and St. Ignace, 51 buildings and 6500 parking spaces." (*Id.*). Comparatively, both Mackinaw City and St. Ignace "do not have public parking lots that allow cars to park for more than 2-3 hours." (*Id.*). But the City acknowledges that since Hoffman acquired both Ferry-Companies, a third-party opened a parking lot near the ferry docks in Mackinaw City and has been providing long-term parking service. (*Id.* at PageID.1129).

According to the City, since Hoffman's acquisitions, the Ferry-Companies have imposed "charges for parking of at last $10 dollars for daily parking." (*Id.* at PageID.1131). And the companies have also eliminated free shuttle services for Mackinac Island employees and residents. (*Id.*). The City alleges that the Ferry-Companies' rates "are significantly higher than the other parking rates charged by ferry services at other locations in Michigan." (*Id.*).

### III.    Procedural Posture

In March 2025, the Ferry-Companies initiated this suit against the City in the Western District of Michigan. (ECF No. 1). The Ferry-Companies asked this Court, under its admiralty jurisdiction, to issue a declaratory judgment interpreting the Franchise Agreement. (ECF No. 1). The City responded with multiple counterclaims. (ECF No. 72). The City first alleged that Ferry-Companies breached their respective Franchise Agreements by refusing to cooperate with the City on rate regulation. (ECF No. 7, PageID.84). The City also asserted various claims under the Sherman Antitrust Act and Michigan antitrust laws. (*Id.* at PageID.82-84).

Shortly thereafter, the Ferry-Companies moved to dismiss the City's Counterclaims for failure to state a claim under Rule 12(b)(1) and Rule 12(b)(6). (ECF No. 18). And both parties moved for preliminary injunctions. (ECF Nos. 24, 35). As to the preliminary injunctions, the Court denied the City's motion but partially granted the Ferry-Companies' request, enjoining the City from implementing its proposed ordinance regulating rates. (ECF No. 50). The Court of Appeals is currently considering the City's appeal.

As to the Ferry-Companies' motion to dismiss, the Court granted in part and denied in part. (ECF No. 58). The Court denied the motion as to the breach of contract claim, allowing that claim to proceed to discovery. (*Id.*). But the Court granted the motion as it pertained to the antitrust claims, finding that the City lacked standing to bring the claims and that the counterclaims contained numerous other pleading defects. (*Id.*).

7

The City reasserted it counterclaims with additional allegations and now moves to join Hoffman as a defendant. (ECF Nos. 63, 65). The City now asserts antitrust claims against both Hoffman and the Ferry-Companies under Section 1 of the Sherman Act for both transportation and parking services (Counts II & IV); Section 2 of the Sherman Act for both transportation and parking services (Counts III & V); Section 7 of the Clayton Act against Hoffman only (Counts II & IV); and for declaratory relief. Again, the Ferry-Companies move to dismiss these counterclaims. (ECF No. 80). Briefing is complete on both motions, so the case is now ripe for decision.

**LEGAL STANDARD**

In considering a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff; accepts as true the plaintiff's factual allegations; and determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). The Court uses the same standard to evaluate a counterclaim as it uses to evaluate the sufficiency of the complaint itself. *See Baxter Bailey & Assocs., Inc. v. Powers & Stinson, Inc.*, 2015 WL 13091368, at *2 (W.D. Tenn. Jul. 10, 2015); *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014) ("[Rule 12(b)] applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."). To survive, a counterclaim must allege sufficient facts to "raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If "the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the [counter]complaint . . . has not shown that the pleader is entitled to relief." *Id*. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In antitrust cases, courts should apply this general pleading standard rigorously. "In the antitrust context . . . 'a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed.' " *CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 571 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 558); *ComSpec Int'l, Inc. v. Uniface B.V.*, No. 2:20-cv-10067, 2021 WL 4169726, at *5 (E.D. Mich. Sept. 14, 2021).

DISCUSSION

The Ferry-Companies' Motion to Dismiss and the City's Motion to Join Hoffman as a Party are intertwined. The success of the City's joinder motion hinges on whether the City's antitrust counterclaims withstand the Ferry-Companies' Motion to Dismiss. Because the Court finds that the City does not have standing to assert antitrust claims against either Hoffman or the Ferry-Companies, the Court grants the Ferry-Companies Motion to Dismiss and with it, denies the City's Motion to Join Hoffman as a Party.

I.    <u>Motion to Dismiss Antitrust Counterclaims</u>

The Ferry-Companies move to dismiss the City's assortment of repleaded federal and state law antitrust claims (Counts II through VII). (ECF No. 80). They argue that, even with the newly alleged facts, the City's claims still fail on multiple grounds. (ECF No. 81, PageID.1601). The Court agrees and grants the Ferry-Companies' motion to dismiss.

1.  **Antitrust Standing**

The Ferry-Companies first argue that the City lacks standing to bring antitrust claims. (*Id.* at PageID.1605). For the following reasons, the Court agrees.

9

Standing is a prerequisite for any antitrust claim. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc). Antitrust standing "is a threshold, pleading stage inquiry." *Id.* at 450. If the "complaint by its terms fails to establish this requirement," the district court must dismiss the case "as a matter of law." *Id.* In fact, because "antitrust discovery can be expensive . . . . federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage." *Id.* As such, it is common practice within the Sixth Circuit to dismiss "lawsuits for lack of antitrust standing under Rule 12(b)(6)." *Id.* (listing cases).[4]

For many years, the Sixth Circuit explained that courts should weigh five factors to determine whether a plaintiff has antitrust standing. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990) (per curiam). But more recently, the Sixth Circuit has instructed that courts must determine whether the plaintiff has alleged (1) an antitrust injury, and (2) proximate causation. *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 155 F.4th 795. 808-10 (6th Cir. 2025). If those two elements are met, then the plaintiff has antitrust standing. *Id.*

The Ferry-Companies focus their dismissal argument on whether the City has adequately alleged an injury. (ECF No. 81). An injury is a "necessary, but not always sufficient" requirement for antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). A "naked assertion of antitrust injury . . . is not enough; an antitrust claimant must put forth factual allegations plausibly suggesting (not merely consistent with) antitrust injury." *NicSand*, 507 F.3d

---

[4] Generally, courts apply the same antitrust standing analysis to claims under both the Sherman Antitrust Act and the Clayton Act. *See, e.g.*, *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 121CV00540AWIEPG, 2022 WL 2791201 (E.D. Cal. July 15, 2022) (" '[A]ntitrust injury' is a necessary predicate for possessing the unique antitrust standing required for claims under the Sherman and Clayton Acts."). As such, the Court finds that its standing analysis applies equally to the City's counterclaims under Section 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

at 451. A sufficient antitrust injury must be "the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " *Id.* at 450 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Because the alleged injury must flow from the Defendant's "unlawful act," simply alleging individual harm is insufficient to establish an injury. A "plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Bassett v. NCAA*, 528 F.3d 426, 434 (6th Cir. 2008) (quoting *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992)); *see also Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1064 (9th Cir. 2001) ("[Plaintiff] alleges nothing more than a personal injury to herself, not an injury to a definable market. . . .  [The] failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings."). "Unless an antitrust plaintiff alleges an injury that arises from an anticompetitive aspect of the practice under scrutiny, the complaint will not survive Rule 12(b)(6) scrutiny." *CBC Companies, Inc*, 561 F.3d at 571–72 (internal quotations omitted). Put simply, that means that the City must allege, as a prerequisite for standing, that Hoffman or the Ferry-Companies engaged in some sort of anticompetitive behavior that harmed competition in some market. *See id.* Without anticompetitive action, no antitrust injury can result.

### A.  The City Has Failed to Allege Anticompetitive Acts That Injure the Market

As this Court previously found, the City originally failed to allege that the Ferry-Companies engaged in any anticompetitive behavior that injured the market. (ECF No. 58). Although the City's has repleaded its counterclaims with more detail, the City's Amended Counterclaims still suffer from the same flaw. Without any injury to the market, the City cannot establish antitrust standing.

As before, the City's antitrust arguments primarily rest on its assertions that Hoffman and the Ferry-Companies now possess a dominant market share of both the ferry service and parking markets after the recent acquisitions. But, contrary to the City's arguments, "by themselves, possessing monopoly power and charging monopoly prices do not violate § 2." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (internal quotations omitted). "Monopolies are condemned under § 2" only where a "business acquires or maintains monopoly power through competitively unreasonable practices." *Gene Cope & Assocs., Inc. v. Aura Promotions, Ltd.*, 692 F. Supp. 724, 727 (E.D. Mich. 1988); *see also Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 2d 996, 1005 (W.D. Wis. 2008) ("Section 2 does not make plaintiff's monopoly power actionable unless it is exercised in a manner that is objectively anticompetitive. . . . Not the possession, but the abuse, of monopoly power violates section 2 [of the Sherman Act]."); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015) ("Having or acquiring a monopoly is not in and of itself illegal. The illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products."). The claimant must show that that business has engaged in exclusionary conduct, even when a business acquires a dominant market share through acquisition. *See WHDH-TV v. Comcast Corp.*, 186 F. Supp. 3d 107, 113 (D. Mass. 2016) (rejecting Section 2 monopolization claim for failure to show exclusionary conduct even though "Comcast possessed unprecedented" market power after acquiring NBC because the "mere possession of market power" does not amount to an antitrust violation). This recitation of law should not come as a surprise—the Court previously warned the City that "market share alone [does not] clear the hurdle." (ECF No. 58). Again, the Court reiterates that even if the

12

Ferry-Companies now possess a dominant market share of both ferry and parking services, that, alone, is not anticompetitive conduct.

As this Court previously noted, "[t]here are no facts in the [Amended] Counterclaim suggesting the actual or attempted exclusion of competitors." (ECF No. 58). When it comes to ferry service, the City has simply alleged that numerous natural barriers prevent competitors from entering the market. (ECF No. 63, PageID.1125-28). But none of those alleged barriers resulted from any anticompetitive or exclusionary conduct on the part of the Hoffman or the Ferry-Companies. Similarly, when it comes to parking service, the City does not allege any conduct on the part of the Ferry-Companies nor Hoffman that shows an affirmative intent to exclude competitors from the market or stifle competition. In fact, a new competitor has recently entered the market—after Hoffman's acquisitions—and has been offering parking services near the Ferry-Companies' docks. (ECF No. 63, PageID.1129). [5]

Without anticompetitive conduct or an injury to the market, the City cannot have suffered any injury caused by "that which makes the defendants' acts unlawful." *NicSand*, 507 F.3d at 451. As such, the City has cannot show that it has antitrust standing to bring its claims.

*B. The City's Individual Injury Allegations Do Not Establish Standing*

Even if the City adequately alleged that the Ferry-Companies engaged in anticompetitive acts that injured the market, the City still would not have standing because it has not adequately alleged that it has suffered the kind of individualized harm sufficient to show an antitrust injury.

Once the plaintiff alleges an injury to the market, the Court can then look to see whether the plaintiff, itself, has suffered an injury that "flows" from that anticompetitive action. *NicSand*,

---

[5] The Court's subsequent discussion on the City's Section 1 and Section 2 claims further highlights how the City has failed to allege any injury to the market or anticompetitive conduct on the part of either Hoffman or the Ferry-Companies.

507 F.3d at 450. The Sixth Circuit recently discussed the kinds of harm that are generally sufficient to establish an individual antitrust injury. *See Acad. of Allergy*, 155 F.4th at 808-10. First, and most straightforward, anticompetitive conduct harms actual consumers who buy at predatory prices. *Id.* at 808. Similarly, anticompetitive conduct harms potential consumers, "who refuse to buy at the higher price." *Id.* Competitors sometimes suffer the right kind of injury, but courts should evaluate these suits "more cautiously." *Id.* at 809. Actual consumers are "preferred plaintiffs that suffer the core antitrust injury." *Id.* at 810 (internal quotations omitted). If a plaintiff is neither consumer nor competitor, however, then the plaintiff is unlikely to establish an adequate injury. *Id.* More particularly, "[w]hen third-party harm is mere 'collateral damage' to (or 'a tangential byproduct of') the anticompetitive conduct, the harm does not count as an antitrust injury." *Id.* (quoting *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016)).

But even if the plaintiff suffers the right kind of harm, they must still show that the defendant's anticompetitive conduct proximately caused that harm. Under this doctrine, the Supreme Court has established a bright-line rule between direct and indirect purchasers. *Id.* at 812; *see Ill. Brick Co. v. Illinois*, 431 U.S. 720, 726–27 (1977). Direct purchasers, who buy the monopolist's product directly from the monopolist, have standing to sue the monopolist even if they pass on their overcharge to others. *Acad. of Allergy*, 155 F.4th at 812-13; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). Indirect purchasers, however, who purchase the alleged monopolist's goods through intermediaries, do not have standing to recover the overcharge that was passed on to them. *Acad. of Allergy*, 155 F.4th at 812-13; *Ill. Brick Co. v. Illinois*, 431 U.S. 720. Courts, however, are not limited to this bright line rule when analyzing proximate causation. "[N]o single formula captures the required proximity." *Id.* (quoting IIA

14

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW § 345a, at 147 (5th ed. 2021)). As such, courts have some flexibility in determining whether, under all the circumstances, the plaintiff has adequately alleged proximate causation.

Here, the City—after failing to allege a specific individualized injury in its original counterclaims—now posits that it will suffer an assortment of harms caused by the Ferry-Companies' alleged antitrust violations in both the ferry services and parking markets. First, according to the City, it suffers "indirect antitrust injury" because the alleged antitrust violations "raise the cost of doing business on the Island, and reduce the value of real property on the Island, diminishing the City's tax base and revenues." (ECF No. 63, PageID.1136). Second, according to the City, it is a "customer" of the Ferry-Companies because it "pays for" its employees' "commuter passes" and "parking fees." (*Id.* at PageID.1136, 1141). Although these allegations bring the City closer to establishing an injury than before, neither of these allegations, as they stand, establish antitrust standing.

To begin, the City's alleged "indirect injuries" fall far short of establishing antitrust standing. Raised cost of business, reduced property value, and diminished tax bases are not the type of harm that "the antitrust laws were intended to prevent." *NicSand*, 507 F.3d at 450. If these harms were to arise, as the City alleges they will, they would be merely "collateral damage" and "a tangential byproduct of" of any ferry or parking service antitrust violation. *Acad. of Allergy*, 155 F.4th at 808-10. This alleged downstream harm is unlike the harm suffered by an actual consumer, potential consumer, or competitor—the only individuals that can suffer the right kind of harm. Accordingly, the City's cannot rely on its alleged downstream, hypothetical harm to establish an antitrust injury.

Without indirect injuries, the City is left with the bare assertion that it suffers injury as a "customer" of the Ferry-Companies because it "pays for" its employees' "commuter passes" and "parking fees." This type of alleged harm can establish a sufficient antitrust injury. After all, actual consumers are "preferred plaintiffs that suffer the core antitrust injury." *Acad. of Allergy*, 155 F.4th at 810 (internal quotations omitted). And municipalities, like the City, can be direct purchasers. *See County of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989).

Even so, the Court finds the City's unique circumstances distinguish it from actual consumers and render its allegations insufficient to establish antitrust standing. To begin, the City isn't a typical ferry consumer. As a municipality, it cannot travel on the ferry service, unlike the 1.5 million tourists and residents that use the ferry service every year. The Ferry-Companies market and provide their transportation services to individuals seeking to go to and from Mackinac Island. The City, as a municipality, cannot fall into that category. Initially, then, the City's consumer status is already somewhat attenuated. Moreover, it is difficult to evaluate the exact nature of the City's purchases from the City's generalized "consumer" allegations. Some specificity matters here. *See CBC Companies, Inc.*, 561 F.3d at 571. For example, the City does not specify whether it pays the Ferry-Companies for the commuter passes directly or whether it simply reimburses its employees for the travel expenses that they incur. If the City simply reimburses its employees for the commuter passes at a later time, then the City's "consumer" label would be even more attenuated than it already is. At that point, the City merely would be offering reimbursements to actual consumers, who suffer the real harm. In that scenario, the City would be more akin to an "indirect purchaser" rather than a direct purchase, which would preclude standing. *See Acad. of Allergy*, 155 F.4th at 813 ("[T]he Supreme Court's bright-line rule bars indirect purchasers from suing *altogether*."). Because the City's injury allegations are

16

closer to "a naked assertion of antitrust injury" rather than one supported with concrete "factual allegations," the Court is unable to properly evaluate the City's "consumer" allegations. *NicSand*, 507 F.3d at 451.

But even if the Court were to construe these allegations liberally on the City's behalf, the Court has more fundamental concerns with the City's assertion that it is merely a "consumer." Unlike the typical consumer, the City is uniquely positioned—it has both contractual and regulatory authority over the Ferry-Companies that allows it to affect their rates. Under Michigan law, the City has authority "to regulate ferries to and from the City." (ECF No. 63, PageID.1107). Under that authority, the City passed an ordinance determining that "no person shall operate a ferry boat service, nor shall any person provide a ferry boat service in the City without such person having first obtained a franchise from the City." (*Id.* at PageID.1108-09). And, according to that ordinance, the City entered into Franchise Agreements with the Ferry-Companies that allow them to provide service to the island for a $50,000 dollar monthly fee. (*Id.*). Further, as part of the Franchise Agreement, the City reserved for itself authority to regulate rates and prices "[i]n the event that no competition is found to exist in ferry boat service."[6] (ECF No. 63-1). If the Ferry-Companies breach that provision, the City can enforce the agreement, as it has already attempted to do in this case. And when the current Franchise Agreements expire in 2027, the City can renegotiate the terms of its Agreements with the Ferry-Companies to come to a more favorable arrangement. Overall, there are multiple regulatory mechanisms available to the City that allow it to influence and control the Ferry-Companies' rates.

In effect, then, the City cannot characterize itself as merely a customer of the Ferry-Companies—it is also their regulator. The City's circumstances are entirely unlike the typical

---

[6] The scope of the City's authority under this contractual provision is at issue in this litigation.

consumer, who has no control over a monopolist's rates and must succumb to the monopolist's super-competitive prices. The typical consumer's only recourse for challenging a business's anticompetitive conduct is through antitrust laws. The City, however, can regulate—as it is attempting to do in this case—the Ferry-Companies' prices independent of any antitrust regulation.

These notable differences all lead to one fundamental question: is the City the kind of petitioner that the antitrust laws were put in place to protect? *See NicSand*, 507 F.3d at 451. The Court does not think so. The City can, and has, invoked multiple mechanisms that could prevent it from suffering a real antitrust injury. Extending the standing doctrine to preclude the City's suit against Hoffman and Ferry-Companies aligns with how antitrust law treats similarly situated parties. *Cf. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (finding that a private entity can be exempt from regulation under antitrust laws where its conduct is "actively supervised" by the state under an "articulated and affirmatively expressed [] state policy" to " 'displace unfettered business freedom' " (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 109 (1978))). Along those same lines, the Court finds that a municipality, like the City, with regulatory authority over a particular business does not have standing to later sue the business for antitrust violations.[7]

For those reasons, the Court finds that the City's alleged injuries do not establish antitrust standing. Because the City lacks antitrust standing, it has no authority to bring any of its antitrust claims. Accordingly, Counts II though VI must be dismissed.

---

[7] Finally, even if the Court construed the City as a consumer, its injury allegations fail as a factual matter. Because the City does not adequately allege that the Ferry-Companies engaged in anticompetitive practices, the City cannot have suffered any harm as a consumer. Without a predatory, anticompetitive rate increase, the City's payments to the Fery-Companies would have been the same whether or not the Ferry-Companies formed the alleged monopoly. Thus, no harm to the City has yet resulted, so the City has no legs to stand on as an "actual consumer."

## 2.  The City Has Failed to Plead Viable Antitrust Claims[8]

Without antitrust standing, the City cannot bring any of its antitrust claims. But even if the City has standing, its antitrust claims still fail on the merits.[9] Accordingly, although unnecessary for resolution, the Court proceeds to discuss the merits of the City's claims and how each one fails.

### A.  Section 2 Monopolization Claims

Because Hoffman's and the Ferry-Companies' alleged market power is at the heart of the City's antitrust claims, the Court begins with the City's Section 2 monopolization claims. As before, the threshold problems with antitrust standing bleed into the Section 2 analysis. For the following reasons, the City fails to state a viable Section 2 claim against both Hoffman and the Ferry-Companies.

A monopolization claim requires a plaintiff to show that a defendant has "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992). Monopoly power is defined as the "power to control prices or exclude competition." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citation omitted). But "by themselves, possessing monopoly power and charging monopoly prices do not violate § 2." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (internal

---

[8] For the purposes of the Court's discussion on the City's Section 1 and Section 2 claims, the Court presumes, without deciding, that the City has adequately defined both markets.

[9] As before, "because the legal requirements of the Michigan antitrust statute mirror those of its federal cousin," Count VI fails for the same reasons as Counts II through V. *Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 684 (6th Cir. 2016). Accordingly, the Court also dismisses Count VI.

quotations omitted). "Monopolies are condemned under § 2" only where a "business acquires or maintains monopoly power through competitively unreasonable practices." *Gene Cope & Assocs., Inc. v. Aura Promotions, Ltd.*, 692 F. Supp. 724 (E.D. Mich. 1988). "[I]llegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015). Even when a business acquires a dominant market share through acquisition, additional exclusionary conduct is required. *See WHDH-TV v. Comcast Corp.*, 186 F. Supp. 3d 107, 113 (D. Mass. 2016). Moreover, the alleged monopolist must have the general intent to exclude others from the market. *Conwood Co., L.P.*, 290 F.3d at 782; *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 318 (6th Cir. 2015). In determining whether conduct may be characterized as exclusionary, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (citation omitted).

The City incorrectly asserts that *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022), and other cases, show that additional exclusionary conduct is unnecessary. The City seems to think that *Facebook* stands for the general proposition that an acquisition resulting in monopoly power violates Section 2. (ECF No. 98, PageID.1729). In *Facebook*, however, the issue was not whether Facebook's acquisitions of Instagram and WhatsApp *created* a monopoly but rather whether Facebook's acquisitions unlawfully *maintained* the monopoly power that it already possessed. *Id.* at 40, 52-55. In fact, the *Facebook* court recognized, like this Court, that "[h]aving a monopoly does not by itself violate § 2. *Id.* at 52. And "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of

anticompetitive *conduct*." *Id.* Applying this standard, the court simply found that Facebook's acquisitions represented anticompetitive conduct that Facebook used to unlawfully maintain its monopoly power. *Id.* at 53. Likewise, in *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606 (W.D. La. 2016), the acquisitions at issue, which the court determined demonstrated anticompetitive conduct, occurred "while [the Defendant] had monopoly power." *Id.* at 612.

Other cases reinforce the distinction between creating and maintaining a monopoly through acquisitions. In *WHDH-TV v. Comcast Corp.*, 186 F. Supp. 3d 107, 113 (D. Mass. 2016), for example, the court rejected a Section 2 monopolization claim because the petitioner failed to show that Comcast engaged in any exclusionary conduct. The court held that even though "Comcast possessed unprecedented power in the Boston commercial television market" after acquiring NBC, that acquisition does not amount to anticompetitive conduct because the "mere possession of market power" alone is not an antitrust violation. *Id.* at 114-15. When read alongside *Facebook*, these cases show that even when a business acquires a dominant market share through acquisition, subsequent exclusionary conduct, such as another acquisition, is still required to establish a viable Section 2 claim.

The case at hand is more like *WHDH-TV* than *Facebook*. The City argues that Hoffman's acquisitions resulted in dominant market power. Unlike *Facebook*, the City does not allege that Hoffman, or either of the Ferry-Companies, dominated the relevant market such that Hoffman acquired MIFC to protect the market power that it already maintained. Like *WHDH-TV*, then, Hoffman's acquisitions alone do not amount to anticompetitive conduct. The City needs to allege more. The City fails, however, to allege any further conduct on the part of Hoffman or the Ferry-

Companies that supports a plausible inference of the general intent to exclude competitors from the market.

First, consider the alleged transportation monopoly. The City alleges that the Ferry-Companies unlawfully maintained their monopoly by "rais[ing] their ferry ticket prices by $2.00 this year." (ECF No. 63, PageID.1128). The City is correct that supra-competitive prices can amount to anticompetitive conduct. *See Abraham & Veneklasen Joint Venture Am.*, 776 F.3d at 334. But these alleged marginal rate increases alone do not rise to a predatory, anticompetitive level. This alleged $2.00 rate increase was the Ferry Companies' first rate change since 2022. (ECF No. 25, PageID.273). A $2.00 rate increase is not inconsistent with CPI increases from 2022 to 2025. *12-Month Percentage Change, Consumer Price Index, Selected Categories*, U.S. BUREAU OF LABOR STATISTICS (showing yearly CPI rate increases ranging from 2.3% to 9.1%), https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-line-chart.htm; *see also* (ECF No. 50, PageID.1039 (Court's previous CPI analysis)). Increasing ticket prices $2.00—bringing Shepler's and Arnold's adult tickets prices to $38.00 and $37.00, respectively—more than likely reflects the increased operational costs that coincide with CPI increases, as the Ferry-Companies stated when they announced the rate increases. (ECF No. PageID.9). Contrary to the City's assertions, this marginal rate increase is not enough to create a plausible inference of general intent by Hoffman or the Ferry-Companies to exercise its alleged monopoly power to control prices.

The City also alleges that the Ferry-Companies' rates are anticompetitive because they are 2-4 times higher than the rates of any other ferry service operating in Michigan. (ECF No. 63, PageID.1128). But the Ferry-Companies' comparably high rates did not arise from market domination—they existed before Hoffman took control of both Ferry-Companies. As mentioned,

22

adults may purchase tickets from Shepler's and Arnold Transit for $38.00 and $37.00, respectively. *Ticket Options*, SHEPLER'S, https://www.sheplersferry.com/ticket-options/#1564014244867-22906af8-0e53; *Summer Rates*, ARNOLD TRANSIT CO., https://www.arnoldtransitcompany.com/summer-ferry-rates/. Before the Ferry-Companies raised their ticket prices by $2.00 dollars in 2025, and before Hoffman acquired both companies, they would have had comparably high rates—roughly $36.00 and $35.00. The Ferry-Companies' pre-monopoly rates highlight that ferry transportation to Mackinac Island is, and has been, a competitive industry with high consumer demand. Thus, the claim that the Ferry-Companies are or have been charging allegedly monopolistic prices, alone, is not enough to show predatory, anticompetitive conduct. *See St. Luke's Hosp*, 8 F.4th 479.[10]

Finally, the City alleges that numerous barriers—the Ferry-Companies' control of the docks, the Ferry-Companies' control of parking, and Franchise Agreement—prevent competitors from joining the market. Assuming that the City's allegations present real entry barriers, they still do not demonstrate exclusionary conduct on the part of Hoffman or the Ferry-Companies. To begin, Hoffman's alleged control over dock space and parking is a consequence of the initial acquisition, not a subsequent action taken by Hoffman or the Ferry-Companies to preserve its market power or exclude competitors. (*See* ECF No. 58, PageID.1089-90). Tellingly, the City

---

[10] The City's attempt to compare the Ferry-Companies' rates to other ferry services around Michigan fails for other reasons. To begin, the other ferry services that the City mentions are outside the pleaded market and thus provide little comparative value. A number of factors could explain the alleged rate differences. Other ferry services—like the ferry service from Michigan to Wisconsin—involve different destinations, travel times, and consumer demand. For example, nowhere does the City allege that any of the other ferry services transport roughly 1.5 million travelers per year, like the Ferry-Companies. (ECF No. 63, PageID.1125). Nor does the City plead that ferry service is one of the only ways to reach those respective destinations. Further, the Ferry-Companies must pay the City a $50,000 fee—with a yearly CPI increase—every month. (ECF Nos. 63-1, 63-2). The City does not allege that the other services are responsible for a similar fee. Any of these factors, and more, could easily explain why the Ferry-Companies have comparably higher rates.

does *not* allege that Hoffman has started purchasing any more dock or parking space after the acquisitions. Nor does the City allege "some sort of tying arrangement by which the Ferry-Companies exploit their power over ferry service (the tying product) to force the City to accept parking (the tied product)." (ECF No. 58, PageID.1085). Moreover, the Franchise Agreements existed long before Hoffman ever came into the picture. In fact, the Franchise Agreement fee, if it is a barrier, is of the City's—rather than the Ferry-Companies'—own making. The City, by ordinance, requires ferry operators to first receive a franchise from the City and then split the monthly fee. Entry barriers, such as these, may be relevant to determining whether an entity possesses monopoly power, but they are irrelevant to determining whether the alleged monopolist has unlawfully abused its monopoly power. *See Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 398-421 (D.D.C. 2025) (demonstrating that entry barriers are relevant to whether a business possess monopoly power but *not* to whether the business has engaged in exclusionary conduct). In its past order, the Court already warned the City that it was looking for exclusionary conduct comparable to "refusing to entertain shared dock access with a potential rival, or purchasing all land in and around the docks so that no competitor could develop parking lots." (*Id.* at PageID.1090). But the City has failed to allege any conduct on the part of Hoffman or the Ferry-Companies that demonstrates a comparable exclusionary intent.

The alleged parking monopoly fails for the same reasons. Even if the Ferry-Companies possessed dominant power in a clearly defined market, the City has failed entirely to show that Hoffman or the Ferry-Companies attempted to exclude competitors from the market. Again, the City alleges that a variety of barriers prevent competitors from entering the market and insulate the Ferry-Companies from competition. But these alleged barriers are natural and do not stem from any action on the park of Hoffman or the Ferry-Companies. Nor have they, in fact,

foreclosed competitors from entering the market—as the City acknowledges, a third-party recently opened a parking lot near the ferry docks in Mackinac City.[11] The City's best attempt at anticompetitive action is its threadbare allegations of increased rates for some limited parking services. But the City does not allege that the Ferry-Companies have increased their standard daily parking rates that are applicable to most consumers. The City also alleges that the Ferry-Companies' rates are comparably higher than other ferry companies in Michigan (ECF No. 63, PageID.1131), but again, the City fails to explain why these out-of-market comparisons are relevant. Overall, although the Ferry-Companies may currently control most of the parking lots in Mackinac City and St. Ignace, that fact alone is far from establishing a general intent to exclude competition from the market.

At bottom, the City simply disagrees with the Court's recitation of antitrust law—that establishing a violation of Section 2 requires more than merely showing market power. (*See* ECF No. 98, PageID.1714). But instead of amending its original claims to fit the Court's recited framework, the City continues to reassert the same, and already rejected, legal arguments. Hoffman's control of the two leading ferry services understandably raises monopoly concerns, but unless and until Hoffman or the Ferry-Companies begin to abuse that power with anticompetitive actions, the City does not have a viable Section 2 claim. As such, the City's Section 2 claim fails on the merits and must be dismissed.

### B. Section 1 Claims

The Court previously dismissed the City's Section 1 claims against the Ferry-Companies under the *Copperweld* doctrine. The City's repleaded Section 1 antitrust claims (Counts II and

---

[11] Other options for entry into the parking market exist. For example, the mainland cities could convert their short term on-street parking to long-term parking.

IV)—this time against both the Ferry-Companies and Hoffman—do not significantly alter the Court's analysis. As such, they still fail and must be dismissed.

As a threshold matter, the City's theory as to how Hoffman and the Ferry-Companies allegedly violated Section 1 remains somewhat unclear. The factual allegations in the Amended Counterclaim focus on alleged collusion between Hoffman and the Ferry-Companies to use their monopoly power to fix ferry service and parking rates. *See* (ECF No. 63, PageID.1137 ("Hoffmann and the Hoffmann Ferry Companies' . . . together have and exercised market power to raise prices for ferry services."); ("These exercises of monopoly power by Hoffmann and Hoffmann Ferry Companies are violations of Section 1 of the Sherman Act."); ("The ferry companies' lock-step increases in rates for parking confirm . . . that they intend to and have raised prices above supracompetitive levels, reduced services, and inflicted injury to competition and their customers.")). This theory coincides with how the City originally pled its Section 1 claims. (ECF No. 7, PageID.83). But in its briefing, the City—perhaps attempting to avoid the effect of the *Copperweld* doctrine—argues that Hoffman's acquisition of the Ferry-Companies, alone, violates Section 1.

To the extent that the City's Section 1 claims allege a post-acquisition conspiracy between Hoffman and Ferry-Companies to fix ferry and parking prices, the claims fail under the *Copperweld* doctrine. As this Court previously explained, under *Copperweld*,

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of §1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

26

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). Simply put, entities with a "unity of purpose or a common design" due to their ownership or control cannot "conspire" together within the meaning of Section 1 of the Sherman Act, so any agreement or coordination between them cannot lead to liability. *Id.* at 752.

This Court has already determined that the City has "pleaded a single corporate consciousness across the Ferry Companies." (ECF No. 58). As before, the City's has continued to assert that all three companies "are owned and managed as one single ferry business." (ECF No. 63, PageID.1112). And they support this assertion with multiple statements and actions by executives from both Hoffman and the Ferry-Companies indicating that they are all one company. (*Id.* at PageID.1112-15). Again, the Court has no trouble concluding that Hoffman and the Ferry-Companies share a "unity of purpose or a common design." *Copperweld*, 467 U.S. at 771. As such, any Section 1 claims premised on price fixing conspiracies after Hoffman's acquisitions are precluded.

To the extent the City alleges a Section 1 violation based on Hoffman's initial acquisitions of both Ferry-Companies, that claim would also fail. The City is correct that *Copperweld* explicitly noted that "a pattern of acquisitions may itself create a combination illegal under § 1, especially when an original anti-competitive purpose is evident from the affiliated corporations' subsequent conduct." *Id.* at 761. Both the Court and the Ferry-Companies agree with the City that sometimes an acquisition or series of acquisitions can violate Section 1.[12] (ECF No. 99, PageID.1756). But, as *Copperweld* states, the "purpose" of the acquisitions must be anticompetitive. 467 U.S. at 761. And, as the caselaw under Section 2 shows, it is difficult to

---

[12] The Court notes, however, that since *Copperweld*, courts typically do not analyze acquisitions resulting in a dominant market power under Section 1. The City does not cite any case post-*Copperweld* that found a violation. And the Court could not find one either. As the Court's Section 2 analysis shows, most courts analyze these kinds of acquisitions as Section 2 claims.

conclude from an acquisition alone that the merging or acquiring companies' intent was anticompetitive. *See WHDH-TV*, 186 F. Supp. 3d at 113. After all, monopoly power alone is not prohibited by Section 2. *St. Luke's Hosp.*, 8 F.4th at 486. Section 2 prohibits only the abuse of that power. Typically, the anticompetitive nature of an acquisition resulting in monopoly power becomes evident only when the company engages in subsequent anticompetitive conduct, as *Copperweld* recognizes. 467 U.S. at 761. Accordingly, if monopoly power alone is not prohibited, then Section 1 typically will not punish an acquisition resulting in monopoly unless subsequent anticompetitive conduct highlights the anticompetitive purpose of the acquisition. *See id.*

As the Court's Section 2 analysis shows, the City has not adequately alleged that either Hoffman or the Ferry-Companies took anticompetitive actions after the acquisitions. The City has not, for example, alleged that the companies have refused to entertain dock access with a potential rival, have been purchasing land in and around the docks so that no competitor could develop parking lots, or formed exclusive agreements with suppliers that restrict them from dealing with potential competitors. Allegations of marginal increases in ferry ticket and parking rates post-acquisition are insufficient. Without any additional anticompetitive conduct, the Court is unable to conclude that Hoffman's acquisitions, alone, violate Section 1, even if they resulted in dominant market power.

Either way, the viability of the City's Section 1 claim is largely irrelevant because the City does not have standing to bring this Section 1 claim. Whatever Hoffman's intended purpose may have been, the City is not the proper entity to bring these claims. As such, the City's Section 1 claims (Counts II and IV) must be dismissed.

## II.    **Motion for Joinder**

The City's motion to join Hoffman as a party rises and falls with its failed antitrust claims. The City's motion rests primarily on the assumption that it asserted viable antitrust claims against Hoffman. But because the Court now dismisses those claims—for a second time—the motion for joinder also must fail.[13] Without the antitrust claims, the City is left only with its breach of contract claim against the Ferry-Companies (ECF No. 63, PageID.1133). The City has no pending claims against Hoffman. As such, the City cannot add Hoffman as a counter-defendant in this lawsuit. *See* Fed. R. Civ. P. 20(a) (noting that a person can be joined as a defendant only if "any right of relief is asserted against them"). Accordingly, the City's Motion for Joinder is denied.

## CONCLUSION

Any time a single entity retains market power over a particular good or service within a distinct geographic region, antitrust concerns understandably arise. But those concerns do not necessarily translate into concrete antitrust violations. Nor does it mean that any particular entity has standing to bring a claim under antitrust law. Although the City cannot bring antitrust claims against Hoffman or the Ferry-Companies, it is not without recourse. Its breach of contract claim against the Ferry-Companies is still pending before the court. If the City prevails, it will have the

---

[13] The City brought its Section 7 Clayton Act claims solely against Hoffman, the potential third-party counter-defendant. Because the City has no antitrust standing, it cannot bring any antitrust claim, including its Section 7 claim, so the Court will not spend time fully analyzing their merits. But the Court has some concerns over their viability. As the City noted in prior briefing, the standard remedy for a Section 7 claim is divestiture. (ECF No. 40, PageID.770). The City, however, also noted that it was not seeking "to unwind the consolidation of the ferry companies." (*Id.*). And here, the City does not pray for divestiture relief in its Amended Counterclaims. (ECF No. 63, PageID.1134, 1147-49). If not divestiture, the Court wonders what the City hopes to achieve by asserting a Section 7 claim against Hoffman. More generally, because Section 7 claims usually involve divestiture, the City's claim is an odd choice at this stage. Typically, Section 7 claims are brought before the violating parties complete the mergers and acquisition. If the merger or acquisition is not yet complete, it is not too much of a burden for the Court to unwind the deal. But unwinding the deal after it is complete? That's less common and substantially more onerous for the parties.

ability to regulate the Ferry-Companies' transportation rates and prices for the two seasons remaining under the Franchise Agreements. And even if the City does not prevail, it will have complete freedom to negotiate terms for all the seasons after 2027.

**ACCORDINGLY, IT IS SO ORDERED** that:

1. The Ferry-Companies' Motion to Dismiss (ECF No. 80) Counts II through VI, and Parts 6 and 7 of Count VII, of the City's First Amended Counterclaim (ECF No. 63) is **GRANTED**.

2. The City's Motion for Joinder of Hoffman Family Companies as a Counterparty Defendant (ECF No. 65) is **DENIED**.

Dated:   February 20, 2026          /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE.