NOT RECOMMENDED FOR PUBLICATION
File Name:  26a0127n.06

No. 25-1668

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<div style="border">
**FILED**
Mar 12, 2026
KELLY L. STEPHENS, Clerk
</div>

| | |
|---|---|
| SHEPLER'S INC, a Michigan corporation d/b/a Shepler's Mackinac Island Ferry Service, and MACKINAC ISLAND FERRY COMPANY, a Michigan corporation doing business as Arnold Transit Company, <br><br>     Plaintiffs-Appellees, <br><br> v. <br><br> CITY OF MACKINAC ISLAND, MICHIGAN, <br><br>     Defendant-Appellant. | ) ) ) ) ) ) ) ) ) ) ) ) ) )    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN <br><br> OPINION |

Before:  McKEAGUE, GRIFFIN, and THAPAR, Circuit Judges.

GRIFFIN, J., delivered the opinion of the court in which McKEAGUE and THAPAR, JJ., concurred.  McKEAGUE, J. (pp. 16–20) delivered a separate concurring opinion.

GRIFFIN, Circuit Judge.

Mackinac Island rests on the eastern side of the Straits of Mackinac, which separates Michigan's upper and lower peninsulas.  No bridge connects it to the mainland  The State of Michigan granted defendant City of Mackinac Island the authority to regulate ferry transportation to and from the Island and issue franchises.  For decades, several ferry lines offered varying services and prices to customers, but in 2024, all the ferry lines came under common ownership. Each ferry line then raised rates and began charging more for other services, such as parking on the mainland.  In response to what the City perceived as a lack of competition between the ferry lines, the City passed several resolutions and ordinances to stifle the impact of the recent consolidation.  The ferry lines sued to enjoin implementation of the City's resolutions and

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

ordinances, and the City sought to enjoin the ferry lines from increasing their rates.  The district court found the ferry lines had a strong likelihood of success and therefore enjoined the implementation of the City's ordinance while this litigation proceeds to a final judgment.  We agree, but only as it relates to the City's parking regulation, not the City's ability to regulate rates and other aspects of ferry transportation.  We affirm in part and vacate in part.

<p style="text-align:center">I.</p>

<p style="text-align:center">A.</p>

Every year, over one million tourists, seasonal residents, and seasonal workers travel by boat to the City of Mackinac Island during the summer.  Because no bridge connects the Island to Michigan's mainland, ferry boats are the most common method of travel to and from the Island.  The ferry lines have docks on the mainland in St. Ignace and Mackinaw City.

Created in 1899, the City of Mackinac Island is the only remaining special charter municipality in Michigan.  Unlike home rule cities, special charter cities are "granted and subject to amendment only by the state legislature."  *Dooley v. City of Detroit*, 121 N.W.2d 724, 730 n.3 (Mich. 1963) (citation modified).  And they "exercise[] only such powers as were expressly granted to them by the legislature in very much the same manner that the powers of private corporations were limited."  *Id.* at 730.  Due to its unique situation of being accessible only by boat, in the City's founding Charter, the State of Michigan granted the City authority

> to establish or authorize, license and regulate ferries to and from the city, or any place therein, or from one part of the city to another, and to regulate and prescribe from time to time the charges and prices for the transportation of persons and property thereon.

Charter Ch. IX, § 1, part 13.  The State also provided that

> The council of [the City] may regulate and license ferries from such city or any place of landing therein to the opposite shore, or from one part of the city to another; and may require the payment of such reasonable sum for such license as to the

<p style="text-align:center">-2-</p>

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

> council shall seem proper and may impose such reasonable terms and restrictions in relation to the keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper, and provide for the revocation of any such licenses and for the punishment, by proper fines and penalties, of the violation of any ordinance prohibiting unlicensed ferries, and regulating those established and licensed.

Charter Ch. XVI, § 1.  Pursuant to this authority, the City implemented the Ferry Boat Code, which has required all ferry boats to obtain a franchise from the City since 1977.  *See Arnold Transit Co. v. City of Mackinac Island*, 297 N.W.2d 904, 905 (Mich. Ct. App. 1980), *aff'd*, 329 N.W.2d 712 (Mich. 1982) (per curiam), *cert. denied*, 464 U.S. 804.

## B.

In 2012, the City entered into three separate, but materially identical, Franchise Agreements with Arnold Transit Company, Shepler's, Inc., and Star Line Mackinac Island Passenger Services, Inc.  The Franchise Agreements run from July 1, 2012, through June 30, 2027, and require the three companies to, among other things, file their schedule of services and rates with the City and pay a monthly franchise fee.  Most relevant here, Section 9 of the Franchise Agreements establishes,

> In the event that no competition is found to exist in ferry boat service to and from the City, the City has the right to assert its jurisdiction over schedules and fares to the extent permitted by present law.

Until 2016, Arnold, Shepler's, and Star Line provided services to and from Mackinac Island.  That year, however, Star Line acquired Arnold and rebranded the companies as the Mackinac Island Ferry Company (MIFC).  And in 2022, the Shepler family sold their company to the Hoffmann Family of Companies (Hoffmann), a family-owned private equity conglomerate.

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

By 2024, MIFC faced severe financial difficulties, so Hoffmann acquired it as well, bringing all the Mackinac Island ferry lines under Hoffmann's ownership and control.[1]

To offset the substantial investment Hoffmann put into rescuing Arnold, both Shepler's and Arnold (the Ferry Companies) notified the City Council that they were raising ferry rates and parking fees.  In late 2024, the Ferry Companies both proposed a $2.00 fare increase for the 2025 season.  The Ferry Companies did not seek approval from the City; they merely provided it notice, as required under the Franchise Agreements.  But the City rejected the fare increase.  The City found that the "recent purchase of all the ferry boat companies by one company presents the City with a monopoly situation, a situation the City has never faced before."  And it passed a resolution "freezing the rates that were in place for the 2024 season."  The Ferry Companies also notified the City of planned increases to parking fees near its mainland landings.  In February 2025, the City similarly rejected the Ferry Companies' proposed parking rates.  The Ferry Companies ignored the City and implemented the increased ferry fares and parking rates.

C.

In March 2025, the Ferry Companies sued the City seeking a declaratory judgment that the City exceeded its authority under the Franchise Agreements and Charter.  One month later, the City answered and asserted a counterclaim, which, among other things, asked for a declaratory judgment declaring that the City holds the power to regulate fares and parking rates under the Franchise Agreements and Charter.

In May 2025, the City adopted Ordinance 629, which upended the existing regulatory scheme by giving the City "complete power to regulate all rates, fares, fees, charges, services,

---

[1] In fall 2024, MIFC was rebranded back to Arnold Transit Company, so we refer to it as Arnold in all subsequent discussion.

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

rules, conditions of service, Schedules of Service and all other matters pertaining to Ferry Boat Service provided by a Ferry Boat Company or Companies."  The Ordinance defines "Service Rate" as "any rate, fare, fee and/or charge the Ferry Boat Company charges for any service related to the Ferry Boat Service, including but not limited to transportation of passenger, transportation of property, luggage, and parking fees."  And it requires all Ferry Companies to "provide any and all documentation needed for the [City] to review Ferry Boat Companies operations, cost to provide Ferry Boat Services, annual revenues, quantity of Service Classes provided, and any other documentation or information requested by the [City]."  Although the Ferry Companies continue to propose service rates and schedules, they now have the "obligation to demonstrate that the proposed Services Rates are just and reasonable for the services provided."  Ultimately, the City will "determine the Service Rates and Schedule of Services."

In the district court, the Ferry Companies moved for a temporary restraining order and preliminary injunction enjoining the City from enacting or enforcing the Ordinance.  The City moved for its own preliminary injunction to enjoin the Ferry Companies from increasing or imposing any new rates, fees, or charges unless the City approves them pursuant to the City's Charter and the Ordinance.

The district court took up the motions, focusing primarily on the parties' respective likelihood of success, which turned on who or what, under Section 9 of the Franchise Agreements, could determine whether competition existed.  The district court found that Ordinance 629 was "a textbook breach of contract, and possibly a substantial impairment of a contractual right" because it circumvented the Franchise Agreements in order to substantially expand the City's regulatory authority.  Looking instead to Section 9, the district court explained the use of passive voice suggested that a third party should determine whether competition exists, not the City unilaterally.

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

Thus, the City lacked authority under the Franchise Agreements to exercise its jurisdiction over the Ferry Companies based merely on the City's conclusion that there was no competition.

Regarding parking rates, the district court held that the Ferry Companies established a likelihood of success on the merits and the City did not. The district court found that neither the Franchise Agreements, the Ferry Code, nor the Charter mention parking regulation. So parking fell outside the City's authority. The district court then found the remaining factors for a preliminary injunction favored the Ferry Companies as well.

With these findings, the district court denied the City's motion for injunctive relief, granted the Ferry Companies' motion, and preliminarily enjoined the City from implementing Ordinance 629. The City appealed.

## II.

In reviewing a district court's grant of a preliminary injunction, we evaluate (1) whether the movant has demonstrated a strong likelihood of success on the merits, (2) whether it would suffer irreparable injury without the injunction, (3) whether the injunction would cause substantial harm to others, and (4) whether issuing the injunction would serve the public interest. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015) (citation modified). We balance these factors, with none being a prerequisite. *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). "At the same time, however, we have also held that 'a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.'" *Id.* (citation modified). We review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant preliminary relief for abuse of discretion. *Id.*

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

<div align="center">A.</div>

"A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation modified), one that should "only be awarded upon a clear showing that the [party] is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Thus, the likelihood of success on the merits factor is "generally the most important factor of a preliminary injunction analysis." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024). The likelihood of success regarding the City's authority to regulate ferry rates depends on what the Franchise Agreements say about the matter. The Ferry Companies argue that the City lacks any such authority; the City argues the reverse.

We interpret contracts to ascertain the intent of the parties. *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 811 (6th Cir. 2007). "Where a contract is unambiguous on its face, extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself." *Id.* But when a contract is ambiguous, a jury must consider relevant extrinsic evidence regarding the parties intent and resolve the question of fact. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003). A "contract is ambiguous when its provisions are capable of conflicting interpretations." *Id.* (quoting *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999)).

<div align="center">1.</div>

As discussed above, Ordinance 629 upended the regulatory scheme and modified the Ferry Companies' obligations. The City relied on Section 9 of the Franchise Agreements to do so. However, Section 9 includes a condition precedent: The City has authority to "assert its jurisdiction over schedules and fares to the extent permitted by present law" only "[i]n the event that no competition is found to exist in ferry boat service to and from the City." But given that

<div align="center">-7-</div>

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

Section 9 uses the passive voice—"no competition is found to exist"—it does not identify *who* or *what* must make this finding before the City can assert regulatory authority over schedules and fares.

The district court found that the use of passive-voice in Section 9 suggests that neither party may unilaterally satisfy the condition.  If the parties intended for the City to satisfy the condition, the provision would say so.  But the provision is silent.  Thus, the district court concluded that the Franchise Agreements likely require a third party to decide whether competition exists.

This is one reasonable interpretation of the Franchise Agreements.  Section 9 is indeed silent, and the choice to not identify any party that could satisfy the condition precedent must have some significance.  *See Klapp*, 663 N.W.2d at 453 (requiring interpretation of a contract to give meaning to every provision).

2.

But the City presents another reasonable interpretation.  The City argues that, even though the passive-voice clause may not identify a specific party, the context still confines the condition precedent to a likely set of actors.  This context includes the fact that the Franchise Agreements incorporate the Charter, which, in turn, grants broad authority to the City to regulate ferry boats. *See Arnold Transit Co.*, 297 N.W.2d at 905–06.  Delegations of legislative authority naturally give broad discretion to an agency—or, in this case, the City—to determine whether and when to exercise that authority.  *See Oshtemo Charter Twp. v. Kalamazoo Cnty. Rd. Comm'n*, 841 N.W.2d 135, 145 (Mich. Ct. App. 2013).  And such determinations are ordinarily "not subject to control and correction by the courts in the absence of fraud or a clear abuse of discretion."  *Moran v. Leadbetter*, 54 N.W.2d 310, 313 (Mich. 1952) (citation modified).  With this context in mind, the City contends that the "only plausible interpretation of Section 9 is that it left the authority to

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

determine whether competition exists where it stood prior to execution of the Franchise Agreements: with the City."

We agree that this reading of the Franchise Agreements presents another reasonable interpretation of the provision.  Passive sentences are often employed "[w]hen the focus of the passage is on the thing being acted on," not on the particular person or thing doing the acting.  *See* Bryan A. Garner, *Modern English Usage* 676 (4th ed. 2016); *see, e.g.*, *Dean v. United States*, 556 U.S. 568, 572 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability."); *Kemp v. Allen*, 2017 WL 2463399, at *2 (Mich. Ct. App. June 6, 2017) ("Absent any express limitations, when a verb is written in the passive voice it does not require that any particular person or thing do the action.").  Section 9 does not specify a particular party or identify a neutral third party to determine whether competition exists.  Thus, its use of the passive voice may communicate that the parties are "agnostic[]" about who or what determines whether competition exists.  *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023) (citation modified).  Therefore, the Franchise Agreements do not clearly preclude the City from making this determination.

The City's position as a municipality supports this read of Section 9.  When the state delegates its sovereign power to a municipality, "the municipality exercises [the power] as agent of the state and upon the conditions prescribed by law."  *City of Niles v. Michigan Gas & Elec. Co.*, 262 N.W. 900, 904 (Mich. 1935).  In this context, the City exercises "legislative power." *People v. Collins*, 3 Mich. 343, 351 (1854).  Section 11 of the Franchise Agreements incorporate the Charter, which provides the City discretion to "pass [] ordinances in relation thereto and for the exercise of the same, *as they may deem proper*, namely . . . to establish or authorize, license and regulate ferries . . . and to regulate and prescribe from time to time the charges and prices for

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

the transportation of persons and property."  Charter Ch. IX, § 1 (emphasis added); *see Arnold Transit Co.*, 297 N.W.2d at 905 (finding Michigan delegated its "exclusive power to franchise ferry boat operators" to the City).  Because the Charter confers discretion to regulate ferries "as [the City] may deem proper," "court[s] may not interfere with its discretion" unless the City exceeds its authority.  *Brent v. City of Detroit*, 183 N.W.2d 908, 909 (Mich. Ct. App. 1970); *see also Veldman v. City of Grand Rapids*, 265 N.W. 790, 794–95 (Mich. 1936).  The City's wield of broad discretion to regulate ferries, under the Charter and therefore Section 11 of Franchise Agreements, supports the City's reading of Section 9.  *See Moran*, 54 N.W.2d at 313.

3.

Because the City's reading of Section 9 is reasonable, and the district court's reading of the same provision is reasonable as well, "the language is susceptible to two or more reasonable interpretations."  *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (quoting *D'Avanzo v. Wise & Marsac, P.C.*, 565 N.W.2d 915, 918 (Mich. 1997)).  Accordingly, we conclude that Section 9 is ambiguous.  And when a contract provision is ambiguous, we must turn to evidence indicating the parties contemporaneous understanding of the agreement.  We have no such evidence in the record before us.  Therefore, whether the City has the authority to regulate ferry rates under the Franchise Agreements remains an open question, and neither party has shown a strong likelihood of success on this issue.

B.

Section 9, however, says more.  The provision limits the City' authority "to the extent permitted by present law."  And Section 11 states,

> This franchise is subject to all applicable provisions of the Charter of the City of Mackinac Island and ordinances thereof, particularly Ordinance No. 465, being the Ferry Boat Code, as well as the laws and Constitution of the State of Michigan, and shall, whenever possible, be construed as consistent with them.

-10-

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

Based on these provisions, the Ferry Companies contend that even if the City can unilaterally satisfy Section 9's condition precedent, Ordinance 629 (which repealed and replaced Ordinance 465) violates Sections 9 and 11 because it allows the City to deviate from the regulatory scheme as it existed in 2012 under Ordinance 465.  In the Ferry Companies' view, Ordinance 465 sets the ceiling of the City's authority.  And the Ferry Companies identify several additional aspects of Ordinance 629 that purportedly exceed the "present law":  (1) the regulation of ancillary services such as parking, priority boarding, or luggage fees; (2) the imposition of new regulatory fees of $150,000 (3) and the requirement to disclose financial information.

Ordinance 465 incorporates the Charter and subjects the Ferry Companies "to the rights and powers of the city and limitations upon the ferry boat company . . . as are set forth in the charter, . . . and such ferry boat company shall abide by and be bound by such rights, powers, and limitations."  And the Charter explicitly permits the City to "establish or authorize, license and regulate ferries to and from the city . . . and to regulate and prescribe from time to time the charges and prices for the transportation of persons and property thereon."  Charter Ch. IX, § 1, part 13. Thus, contrary to the Ferry Companies' understanding, Ordinance 465 contains no limit to the City's authority.  To determine whether an aspect of Ordinance 629 violates "present law," we look to the authority granted in the Charter—not the regulatory scheme of Ordinance 465.

First, Ordinance 629 authorizes the City to "exercise complete power" over "rates, fares, [and] charges."  This falls squarely within the authority delegated under the Charter to "regulate and prescribe the charges and prices."  Charter Ch. IX, § 1, part 13.  Next, the Charter provides that the City may regulate the "transportation of persons and property."  *Id.*  Priority boarding and luggage fees also fall squarely within this authority.  And the Charter similarly provides broad authority to "require the payment of such reasonable sum of such license" and "impose reasonable

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

terms and restriction in relation to the keeping and management of such ferries." *Id.*  Thus, the City can reasonably charge a regulatory fee and require certain financial disclosures in its regulation of the Ferry Companies.  *Cf. Graham v. Kochville Township*, 599 N.W.2d 793, 799 (Mich. Ct. App. 1999) (discussing regulation fees).

But parking is another story.  The City insists that it can regulate all ancillary charges, including parking.  In the City's view, because money is fungible, there is no difference between customers paying $30 to park and $30 for a boat ticket, or customers paying $55 to park and $5 for a boat ticket.  Although true in some respects, the City overlooks that customers are not required to park at the Ferry Companies' mainland lots to purchase a ferry ticket—even if most do.  The City further insists that "ferry" includes "landings on the shore," *Chilvers v. People*, 11 Mich. 43, 52 (1862), and therefore includes all operations necessary to provide "a continuation of the highway from one side of the water over which it passes to the other," *Champion's Auto Ferry, Inc. v. Michigan Pub. Serv. Comm'n*, 588 N.W.2d 153, 157 (Mich. Ct. App. 1998).  But as the district court noted, these statements of law still say nothing about parking.

To understand the meaning of a word, we look to "a dictionary from the era in which the legislation was enacted." *In re Certified Question*, 885 N.W.2d 628, 631 (Mich. 2016).  In the late 19th century, "levee" and "landing" were used synonymously in this context.  *See City of St. Paul v. Chicago, M. & St. P Ry. Co.*, 68 N.W. 458, 460 (Minn. 1896).  Accordingly, similar to the modern-day definition, a landing is "a landing place on a river or lake; a place on a river or other navigable water for lading and unlading goods and for the reception and discharge of passengers to and from vessels lying in the continuous waters, which may be either a wharf or pier or the natural bank." *Levee*, Black's Law Dictionary (2d ed. 1910); *see also Landing*, Black's Law Dictionary (12 ed. 2024).  A parking lot does not fit within this definition of "landing."  And as a

-12-

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

practical matter, many of the Ferry Companies' parking lots are detached from the ferry landings (or docks, as one may call them).

Finally, all the parking lots that the City seeks to regulate are outside its territorial borders—they are in St. Ignace and Mackinaw City, cities on the mainland, miles across the water from the Island. If the State of Michigan sought to grant the City broad extraterritorial authority over substantial land in St. Ignace and Mackinaw City, it would have said so. *See Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.*, 573 N.W.2d 611, 613 (Mich. 1998).

The City, relying on a recent North Carolina case, *North Carolina ex rel. Utils. Comm'n. v. Bald Head Island Transp., Inc.*, 908 S.E.2d 851 (N.C. Ct. App. 2024), contends that, although Michigan law does not use the term "ancillary services," its characterization of ferry services inherently includes such services. *See Champion's Auto Ferry, Inc.*, 588 N.W.2d at 157. The City reasons that, because parking is necessary to continue from one side of the water to the other, parking is part of the ferry franchise. But this argument strains credulity.

First, parking is not required. Second, unlike the clear statutory language in *Bald Head* that incorporated ancillary services in its definition of "services," nothing in the Charter suggests that the City has the authority to regulate ancillary services unrelated to the explicit carriage and transportation of persons and property to and from the Island. Accordingly, we conclude that the Ferry Companies have a strong likelihood of success in proving that the City lacks the authority to regulate parking.

## C.

In sum, we conclude that the competition clause of Section 9 of the Franchise Agreements is ambiguous. Therefore, although both parties have some likelihood of success, neither party can demonstrate a *strong* likelihood of success regarding whether the City can regulate ferry rates.

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

However, the Ferry Companies have demonstrated a strong likelihood of success regarding their challenge to the City's parking regulations.[2]

<div align="center">III.</div>

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).  Harm from the "denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Any harm suffered by the Ferry Companies because of the City's regulation of ferry and parking rates would be mostly monetary.  The Ferry Companies disagree, arguing that they will never be able to recover higher fares from customers if they prevail on these issues; yet, they could readily provide refunds if they do not.  But although refunds may be easier to issue, we conclude that any alleged harm by the Ferry Companies would be compensable by monetary damages in a breach-of-contract claim.  Next, the Ferry Companies contend that ceasing ferry services and having to provide financial information to the City constitute irreparable harm.  But the Ferry Companies offer no evidence to support either conclusory assertion.

The City counters that it will suffer irreparable injury because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)

---

[2] The district court remarked that the City's actions possibly violated the Contracts Clause of the Constitution.  U.S. Const. art. 1, § 10, cl. 1; *see also Sveen v. Melin*, 584 U.S. 811, 819 (2018).  But because the district court did not reach this constitutional question and the Ferry Companies did not brief the issue on appeal, we decline to address it.  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

<div align="center">-14-</div>

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

(citation modified).  Because the City wields the authority of Michigan to regulate ferry boats to and from the City, we agree that this factor favors the City.

<div align="center">IV.</div>

The public interest and balance of the equities also favor the City.  The City provided evidence that the ferry rates have a direct effect on the local economy and society.  Declarations from residents, family members of residents, and other visitors reflect that higher rates discourage travel to the Island.  And ultimately, the public interest and equities favor the City maintaining control over the principal means of transportation to the Island.

<div align="center">V.</div>

Because we conclude that Section 9 is ambiguous, both parties can demonstrate only some likelihood of success.  The remaining factors, although favoring the City, are insufficient to warrant a preliminary injunction in the City's favor.  Thus, we vacate the preliminary injunction in part, but because the Ferry Companies have a strong likelihood of prevailing on the issue of parking, we affirm the district court with respect to parking.

In sum, the City remains enjoined from implementing and enforcing Ordinance 629 with respect to parking.  However, at this stage of the proceedings, the City may implement Ordinance 629, or any subsequently enacted ordinance, regulating ferry rates and fares, consistent with this opinion and in accordance with the authority vested in the City by the Charter and present law.

<div align="center">* * *</div>

For the foregoing reasons, we affirm in part and vacate in part the district court's preliminary injunction.

<div align="center">-15-</div>

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

McKEAGUE, Circuit Judge, concurring.   I join the court's opinion in full. I write separately to highlight additional reasons why this preliminary record does not support a finding that Section 9 of the Franchise Agreements has been triggered, which further cuts against the propriety of injunctive relief.

Start with procedure. The Franchise Agreements are silent as to what form a competition finding must take. Need it be in the form of an ordinance? Is a resolution sufficient? What type of notice is required? Must the City specifically invoke the Franchise Agreements? Neither the parties' briefing nor the district court's opinion confront those questions head on. Instead, all seem to assume that the City made a procedurally sufficient finding of no competition—most directly through a December 2024 resolution.

But this record does not clearly resolve that issue. True, near the end of 2024, in line with the Franchise Agreements, the Ferry Companies informed the City of their intent to raise ticket fares and prices for other services, like baggage fees and parking. And at a subsequent City Council meeting, the City purported to reject those increases and freeze rates at then-current levels. *See* Meeting Minutes, R. 36-9, PageID 505. But the City concluded only that the "recent purchase of all of the ferry boat companies by one company presents the City with a *monopoly* situation." *Id.* (emphasis added).

Conspicuously absent from that resolution is any mention of a lack of competition. Perhaps the City did not need to use the word "competition." But that conclusion is not apparent from the Franchise Agreements. Or maybe the Ferry Companies are content to concede the procedural sufficiency of the City's findings or waived an argument to the contrary. Even still, this ambiguity seems worthy of attention on remand.

-16-

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

Turning to the substantive question, the meaning of "competition" is similarly uncertain. The Franchise Agreements do not define competition. For its part, the City says Section 9 was triggered when Hoffman purchased both Ferry Companies. *See* Meeting Minutes, R. 36-9, PageID 505; Appellant's Br. at 37-38. So, it seems to suggest that common ownership, standing alone, marks a lack of competition.

Again, that conclusion is not clear from the record before us. Under Michigan law, undefined contract terms are given their plain and ordinary meaning, which can be ascertained from dictionary definitions. *McGrath v. Allstate Ins. Co.*, 802 N.W.2d 619, 622 (Mich Ct. App. 2010); *Exclusive Cap. Partners, LLC v. City of Royal Oak*, — N.W.3d —, 2024 WL 4982606, at *14 (Mich. Ct. App. Dec 4, 2024) (adopting dictionary definitions of competitive in interpreting undefined statutory language). With that in mind, consider various common definitions. Competition, for example, is defined as "the effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms." *Competition*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/competition (last visited March 11, 2026). And another dictionary notes that the "essence of competition is rivalry." *Competition*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining competition as a "struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties").

To be sure, those definitions can be read as pointing toward the City's understanding. Although sister subsidiaries exist as separate entities, when they are commonly owned it may seem unintuitive to say a rivalry exists between them, or that one is acting independently to best the other. And, as the City sees it, the facts here provide an apt illustration. Shepler's boats have (at times) been used to fulfill Arnold's schedule demands. Shepler's and Arnold's respective chains of

-17-

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

command both end at Hoffman Marine's president, and Chris Shepler (for a time) acted as president of Arnold. And, at various points, the Ferry Companies have held themselves out as a single entity, or, at the very least, indicated that they were acting for a common benefit.

But, as the district court pointed out, that is not the only plausible read. *See* Opinion and Order, R. 50, PageID 1045. Competition, for example, might exist so long as consumers have a real choice in carrier, level of service, or price points. Through that lens, competition could remain if subsidiaries are offering separate services at different rates because they are—by some measure—acting independently to secure the business of customers based on more favorable terms or services. *See Exclusive Cap. Partners, LLC*, 2024 WL 4982606, at *15 (finding a competitive process where criteria allowed for "meaningful distinctions between applicants"). And here, the Ferry Companies do that—Arnold and Shepler's remain distinct entities and charge different prices for different services. A visit to their websites by a prospective ferry-goer proves as much. *See* SHEPLER'S, https://www.sheplersferry.com/ (last visited March 11, 2026); ARNOLD TRANSIT COMPANY, https://www.arnoldtransitcompany.com/ (last visited March 11, 2026). From that perspective, it is not unreasonable to say that this is "a situation in which someone is trying to win something or be more successful than someone else." *Competition*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/dictionary/english/competition (last visited March 11, 2026).

Antitrust concepts of competition provide little clarity one way or the other. To start, the Franchise Agreements do not expressly incorporate antitrust law. But even if they did, broad antitrust principles provide no clear answer as to whether competition was lacking on these facts. Assuming competition and monopoly are synonymous in the context of the Franchise Agreements (which we can't decide on this record), determining whether a firm exercises illegal monopoly power is a multi-faceted inquiry. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

("The offense of monopoly under [§] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021). It certainly requires more than asking if two entities are commonly owned.

True, as the City points out, antitrust law sometimes treats subsidiaries as a single entity in evaluating whether they unlawfully conspired to impact competition. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984); *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir. 1987) (applying *Copperweld* and holding that "two subsidiaries which are wholly-owned by the same parent" are "not separate enterprises" for the purposes of Sherman Act § 1 liability). And the City relies on that principle to support the conclusion that the Ferry Companies are not competing. But again, even accepting that conclusion, the record at this stage does not reflect one way or the other whether the parties intended for antitrust concepts to define the meaning of competition in the Franchise Agreements.

* * *

The district court did not attempt to resolve these complex questions about competition. Quite the opposite, it explained that it need not "even approximate probability of success beyond saying both views are plausible." Opinion and Order, R. 50, PageID 1045. And it "is the general rule that a federal appellate court does not consider an issue not passed upon below." *Jackson v. City of Cleveland*, 925 F.3d 793, 812 (6th Cir. 2019) (citation modified). More to the point, the parties continue to actively litigate these issues. So we need not endeavor to answer these questions today.

-19-

No. 25-1668, *Shepler's Inc. v. City of Mackinac Island*

Yet, because the Franchise Agreements can "reasonably be understood in different ways," they are ambiguous under Michigan law. *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 314 N.W.2d 440, 441 (Mich. 1982). That is true in more ways than one. As a result, neither party can show a strong likelihood of success on the merits at this preliminary stage. On remand, it will be up to the district court to resolve Section 9's apparent ambiguities in the first instance with the benefit of a more developed record. But until the questions of whether there is competition and who gets to decide are resolved, injunctive relief is improper. As the parties litigate those issues, they should do so cognizant of the district court's repeated admonitions that "[r]egardless of who ultimately prevails . . . the Franchise Agreements expire by their terms next year, meaning that the parties must negotiate new terms very soon or risk disrupting ferry service." Opinion and Order, R. 125, PageID 2279; *see* Opinion and Order, R. 50, PageID 1056.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 25-1668

SHEPLER'S INC., a Michigan corporation d/b/a
Shepler's Mackinac Island Ferry Service; MACKINAC
ISLAND FERRY COMPANY, a Michigan corporation
doing business as Arnold Transit Company,

      Plaintiffs - Appellees,

      v.

CITY OF MACKINAC ISLAND, MICHIGAN,

      Defendant - Appellant.

> **FILED**
> Mar 12, 2026
> KELLY L. STEPHENS, Clerk

Before:  McKEAGUE, GRIFFIN, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Marquette.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the preliminary injunction of the district court is AFFIRMED IN PART and VACATED IN PART.

**ENTERED BY ORDER OF THE COURT**

*Kelly L. Stephens*

_____
Kelly L. Stephens, Clerk